## HAAS v. LEO FEIST, Inc., et al.

(District Court, S. D. New York. May 23, 1916. On Rehearing, June 8, 1916.)

1. COPYRIGHTS ⬚83—INFRINGEMENT—EVIDENCE.
   In an action for infringing a copyrighted song, evidence *held* to warrant a finding of infringement.
   [Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 74–76; Dec. Dig. ⬚83.]

2. COPYRIGHTS ⬚52—INFRINGEMENT—DAMAGES.
   One who publishes a song infringing an earlier copyrighted song is liable in damages, regardless of his innocence of intent.
   [Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 50; Dec. Dig. ⬚52.]

3. COPYRIGHTS ⬚87—INFRINGEMENT—ACCOUNTING.
   Where a copyrighted song is infringed, and defendant is required to account, the accounting will follow the ordinary rules governing equity.
   [Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 81; Dec. Dig. ⬚87.]

4. COPYRIGHTS ⬚87—INFRINGEMENT—DELAY.
   Those interested in a copyrighted song after learning of the infringement delayed proceedings. Thereafter the publisher, who was innocent of any intentional wrongdoing, expended large sums in pushing the sale of the song. *Held* that, as against him, the owners of the copyright could not recover any profits accruing after they discovered the infringement, but as against the actual infringer they might recover any profits, this being particularly true where the song was of a purely ephemeral nature.
   [Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 81; Dec. Dig. ⬚87.]

5. COPYRIGHTS ⬚90—INFRINGEMENT—ATTORNEY'S FEES.
   Where the owners of a copyright, which was infringed, did not make objections on first discovering the infringement, and thus allowed defendant to expend large sums of money in advertising, an allowance of attorney's fees, being a matter of discretion, will not, in a suit for injunction and an accounting, be granted.
   [Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 85; Dec. Dig. ⬚90.]

### On Rehearing.

6. COPYRIGHTS ⬚75—VALIDITY—APPLICATION.
   Copyright Act March 4, 1909, c. 320, § 9, 35 Stat. 1077 (Comp. St. 1913, § 9530), declares that any person entitled thereto may secure a copyright for his work by publication with the required notice of copyright, while section 18 (Comp. St. 1913, § 9539) declares that the notice of copyright shall be accompanied by the name of the copyright proprietor. A copyright proprietor first took a copyright for a song in his own name, but the printed copies stated the copyright owner to be a company which had no existence. On being asked to correct the discrepancy, the proprietor again applied in his own name, but stated he was president and treasurer of the fictitious company, and all copies bore the name of the company. By the laws of the state in which the proprietor resided the use of such name was illegal. *Held* that, while a contract made under such fictitious name might be enforced in the courts, yet relief protecting such name could not be granted, and therefore no suit for infringement of copyright will lie.
   [Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 65; Dec. Dig. ⬚75.]

---

⬚For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by Harry Haas against Leo Feist, Incorporated, and another. Decree for an injunction and an accounting by defendants.

This is a suit in equity to enjoin the infringement of a copyrighted song entitled, "You Will Never Know How Much I Really Cared." In the spring of 1914 the plaintiff, who was at that time in the employ of one Adolph Deutsch, composed the melody and chorus of the song in question, which was reduced to notation by one Rouch, and for which one Cahalin wrote some words. A copyright to the song was taken in the name of the Haas & Cahalin Music Company, a trade-name of Deutsch. Haas was to get one-third of all the profits from the sale of the song, and Cahalin one-third, and Deutsch the remaining third. About 2,000 copies were struck off, 1,000 for sale and 1,000 to be distributed among singers and other performers in the hopes of popularizing it. All the copies were sold by the 1st of January, 1915, but the song proved 'a failure, except to the extent of the 1,000 copies mentioned, and no further edition was published. In November of 1914 Cahalin, who had a number of the songs for distribution, gave one to Samuel Smith, a cabaret singer, who at the time was in and out of the studio of the defendant, Leo Feist, Incorporated, where the defendant Piantadosi was employed. About the middle of December, 1914, Cahalin called at the defendant Feist's studio and there saw Smith and the defendant Piantadosi. Smith invited him to come in to hear a song which Piantadosi had just written and which they were both to exploit. He went in, and Piantadosi played upon the piano the infringing song, which is entitled, "I Didn't Raise My Boy to be a Soldier." Cahalin at once was struck with the similarity between the chorus of Piantadosi's song and Haas', but said nothing at the time. In December the defendant Feist began widely to advertise the infringing song in newspapers all over the country. It was copyrighted on December 19, 1914, as an unpublished work, and as a published work on January 5, 1915, after which it was put on sale, and at once sprang into the widest possible popularity. During the first three months of 1915 more than 650,000 copies were sold, but, being of a most ephemeral and trivial character, its vogue quickly diminished, and at present it has substantially disappeared from the market. Haas first heard the song in the latter part of January, 1915, when performed at a public restaurant, and the similarity between the choruses at that time struck him. He and Cahalin spoke of it together during the month of January, but did nothing until the following March, when they consulted a lawyer, who in turn took no action until this suit was brought on the 28th of January, 1916, at which time the song had long since run its course.

The defendant Feist has a large publishing house in the city of New York and employed the defendant Piantadosi as a casual composer of melodies, though he has small knowledge of musical notation and small skill in playing. His custom was, when he composed a song, to play it over to some other employé of Feist, in this case one Danks, who took down the simple theme upon a "lead sheet," as it is called, and afterwards worked it up into so much musical form as was necessary, for which work the defendant Feist paid Danks by the piece. The whole melody of the song, "I Didn't Raise My Boy to be a Soldier," Piantadosi gave to Danks during the week of November 21–28, 1914, as appears with certainty by the memorandum which Danks made at the time and upon which he charged the defendant Feist. Piantadosi swore that he had composed it about the middle or latter part of October in the year 1914, at which time he had never heard of the plaintiff's song. He testified that the words were in existence before that time, and that it was to them that he had written the music, although the author of the words was not called, nor was his presence accounted for. He denied that Smith had ever given to him a copy of the plaintiff's song, or that at the time when he wrote the song Smith was in the employ of the defendant Feist, or that he ever played over the song for Cahalin personally while Smith was present, as Cahalin testified. The plaintiff in rebuttal called Woods and Dully, who each swore that Piantadosi in December, 1914, played the song for Cahalin in their presence, as Cahalin had said. Neither party called Smith, who was said to be in Canada at the time of the trial.

William H. Griffin, of New York City, for plaintiff.

Nathan Burkan, of New York City, for defendant Leo Feist, Incorporated.

Charles Goldzier, of New York City, for defendant Piantadosi.

LEARNED HAND, District Judge (after stating the facts as above). [1] Piantadosi's piracy of the chorus seems to me sufficiently established for a finding. That Cahalin gave a copy to Smith and that Smith had access to Piantadosi I believe upon the weight of evidence. Cahalin was a better witness than Piantadosi, who did not impress me, and who was not only contradicted in one matter by Woods and Dully, but was proved untruthful as to his borrowing of themes upon other occasions. The opportunity I therefore find to have existed at about the proper time. For the remaining part of the inference, I rely upon such musical sense as I have. I am aware that in such simple and trivial themes as these it is dangerous to go too far upon suggestions of similarity. For example, nearly the whole of the leading theme of the plaintiff's song is repeated literally from a chorus of Pinafore, though there is not the slightest reason to suppose that the plaintiff ever heard the opera. Nevertheless, between the two choruses in question there is a parallelism which seems to my ear to pass the bounds of mere accident. If the choruses be transposed into the same key and played in the same time, their similarities become at once apparent. In certain of the bars, only a trained ear can distinguish them, and their form and rhythm is quite the same. It is said that such similarities are of constant occurrence in music, and that little inference is permissible. Perhaps I should not take them as enough without the opportunity proved, the habits of Piantadosi shown in other instances, and the serious question of his credibility; but it would be absurd not to regard them as evidence of the most impressive character in combination with the rest. The case is not of the mere suggestion of a bar common to each, but of a continuously suggestive melodic parallelism, except at the end. Identity was not to be expected, but derivation seems to me proved.

[2] The plaintiff's right to damages against the defendant Feist, regardless of its innocence, is unquestionable. Gross v. Van Dyk Gravure Co., 230 Fed. 412, —— C. C. A. ——. And in spite of some language in that opinion looking to the possibility of a different rule for profits, I think the same should apply to them as to damages. When, as in copyright, the law provides a form of notice, it imposes upon every one at his peril the duty to learn the facts conveyed by the notice. Without some such rule it could not be a tort innocently to copy a copyrighted work, because it could not be said that among the reasonable result of the defendant's acts was comprised an infringement. It becomes a tort only when the statute imposes a duty on every one to advise himself of the copyright. I cannot see why there should be any difference between damages and profits in this respect. Hence a decree for an accounting of profits will go against both defendants.

[3, 4] It does not necessarily follow, however, that the accounting shall be exempt from the usual principles of equity. Indeed, the con-

duct of the plaintiff may have a controlling effect upon it. West Pub. Co. v. Edward Thompson Co., 176 Fed. 833, 100 C. C. A. 303. The plaintiff's assumption that the statute always rigidly requires an accounting is shown by that case to be without warrant. The delay was of 16 years in that case, but the infringing publication took that long to appear, and the principle is as well illustrated in the case at bar as it was there. Equity will control its peculiar remedy of an account of profits according to its own sense of justice. It must be obvious to every one familiar with equitable principles that it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends large sums of money in its exploitation, and to intervene only when his speculation has proved a success. Delay under such circumstances allows the owner to speculate without risk with the other's money; he cannot possibly lose, and he may win. If the defendant be a deliberate pirate, this consideration might be irrelevant, and I think it such as to Piantadosi; but it is no answer to such inequitable conduct, if the defendant Feist is innocent, to say that its innocence alone will not protect it. It is not its innocence, but the plaintiff's availing himself of that innocence to build up a success at no risk of his own, which a court of equity should regard. A few weeks' delay in the case of a song so ephemeral as this may have the same effect as 16 years, when the publication is a legal encyclopedia in 30 volumes.

This rule cannot be effectively applied until there is a reference. Cahalin had a beneficial interest in the song to the extent of one-third. His knowledge of the proposed infringement went back to December, and debars him from any profits whatever, since the defendant did most of its exploitation after that time. To the extent, therefore, of one-third of the profits, the plaintiff cannot recover. Haas learned of the infringement from Cahalin about the middle of January, and he cannot recover, to the extent of his interest of one-third, after that date, provided the defendant spent substantial sums in exploiting the song thereafter. It would be impossible to say how much of its subsequent success may have been due to its subsequent exploitation. Deutsch, who was the legal copyright owner, does not appear to have had personal notice of the song, and his interest may be affected by no estoppel. The relations of Haas, Cahalin, and Deutsch will be the subject of inquiry upon the reference. It may very well develop that the three stood in such relation that notice to one was notice to all; the master will exercise a reasonable degree of latitude in inference upon that subject. It is impossible, before such facts are ascertained, more precisely to fix the rights of the parties.

It may perhaps be impossible for the defendant Feist, under the rule in Dam v. Kirk La Shelle, 175 Fed. 902, 99 C. C. A. 392, 20 Ann. Cas. 1173, 41 L. R. A. (N. S.) 1002, to avoid a recovery of all the net profits subject to these limitations, although it is perfectly apparent to unsophisticated common-sense that the song's success was due to its sentiment and its appositeness to a certain strain of popular feeling at the time. This makes it all the more pressing that, if Haas and Cahalin allowed the matter to go on without protest, they should be defeated in such a speculative enterprise as far as the rules of law allow.

[5] There must be costs, since the statute requires it; but there will be no attorney's allowance, for that rests in discretion. There were no damages (for there was nothing of value to injure), unless the accounting turns out wholly in favor of the defendants, in which case the damages against Feist will be $250.

A decree may therefore pass for an injunction and an accounting. The defendant Piantadosi must account without condition; but, upon the defendant Feist's accounting, the master, after first stating the account in full, with proper credits for all the exploitation of the song, and ascertaining the net profits, will consider whether Haas' one-third shall be allowed after January 15, 1915, or whenever he finds Haas learned of the song, and report the proper figures upon the several hypotheses open. He will then consider whether Deutsch's one-third while he had title was not affected by notice of the proposed infringement, and, if so, to what extent.

## On Rehearing.

The defendant now moves for a rehearing upon new proof, which I have heard, and upon a point of law raised in the answer, but not previously urged in the argument. As to the new proof it has not changed my conviction; the witness Gilhooly appeared much more convincing to me than Smith, and the result was only to confirm my belief that Smith got the song at about the time Cahalin originally says he gave it to him.

[6] The point of law is this: Deutsch, the copyright proprietor, was a maker of raincoats, and employed Haas and Cahalin on a salary to write songs and words for him, giving them each also a third interest in the profits. The agreement was that Deutsch should have title to the copyright and should take it out personally. His first application to the Copyright Office on April 22, 1914, was in his own name, but the printed copies of the song stated the copyright owner to be "Haas & Cahalin Music Company." When asked to correct the discrepancy by letter of April 27, 1914, he filed a new application April 28, 1914, again in his own name, and wrote a letter, saying that he was president and treasurer of the Haas & Cahalin Music Company, of which he was sole owner. The letter was certainly misleading, if not actually false. There was no such company, but the name was merely fictitious, chosen by him for his own purposes as a trade-name in the venture which he proposed with Haas & Cahalin. All the copies of the song bore the name "Haas & Cahalin Music Company"; none bore the name "Deutsch."

Section 18 of the Copyright Act requires that all copies shall bear the "name of the copyright proprietor," in compliance with section 9. Therefore the question is whether the name, "Haas & Cahalin Music Company," was the name of Deutsch, the copyright proprietor. It may be that a copyright proprietor may make his application for registration in his real name, and still use an assumed name upon his notices (Werckmeister v. Springer Lith. Co. [C. C.] 63 Fed. 808), although it is quite possible that in that case both the application and the notice were in the assumed name (Werckheimer v. Pierce & Bush-

nell Mfg. Co. [C. C.] 63 Fed. 445). I may assume, however, that the use of two names does not invalidate the copyright, provided the proprietor has the right to use either. No doubt he may use any name both in applying for registration and in making his notice of copyright; but it seems to me quite clear that the names which he uses must be legal where he uses them, else they cannot be called his name at all. The trouble in the case at bar was that Deutsch was forbidden by the laws of New York, of which he was a citizen, to use the name, "Haas & Cahalin Music Company." He was forbidden in the first place to use the name "Company" by section 22 of the Partnership Law (Consol. Laws, c. 39) and section 924 of the Penal Law (Consol. Laws, c. 40), and these same provisions forbade his using the name "Haas & Cahalin" as his partners when they were not partners. This prohibition is absolute regardless of any certificates. Nothing could have made it valid. If the name be thought to be a merely fictitious one, he was forbidden to use it by section 440 of the Penal Code, which is a quite independent provision and does not take the place of section 924. Jenner v. Shope, 205 N. Y. 66, 98 N. E. 325. At common law it is true that a man may adopt any name he chooses so long as he be engaged in no fraud, and he need not use it exclusively in all his businesses. But New York has regulated this common-law right, and limited it by the statutes mentioned, and so under the law of Deutsch's domicile, by which he was governed, he had not the common-law right to use any name that he chose.

This statute has been many times before the courts of New York, but in every case, so far as I have found, as a defense to actions upon contracts executed by one of the parties in an illegal name. Those defenses have failed each time, the courts as a rule saying that, no matter whether the name be illegal or not, the contract was actually made, and was no less an obligation because the obligee had used a name which he ought not to have used. On principle there can be no question of this doctrine, for a contract is made with a person, and not with a name, and it is an irrelevant defense in an action on contract that the party may have committed a crime provided it does not affect the contract itself. In some cases there is talk of the distinction between an executory and executed contract, but this was abandoned and the law of New York became settled, as I have stated. The most important cases are Gay v. Seibold, 97 N. Y. 472, 49 Am. Rep. 533; Wood v. Erie R. R. Co., 72 N. Y. 196, 28 Am. Rep. 125; Sinnott v. German-American Bank, 164 N. Y. 386, 58 N. E. 286. There are many cases in the Appellate Division which it is not necessary to cite, as the preceding cases control.

It so happens that in none of the cases, either in the Court of Appeals or in the Appellate Division, did the plaintiff sue in equity, and it therefore must be still held an open question whether his use of an illegal name would disqualify him from suing there. That question in my judgment does not arise here, as I shall show hereafter, and I wish it to be distinctly understood that I do not dismiss this bill on the theory that the plaintiff does not come into equity with clean hands. The vice in my judgment goes to the notice itself and the

statute forbids a suit where notice has not been given. Section 12. Yet I can hardly think that the courts of New York would permit a plaintiff to protect an illegal name, for example, against unfair trade use, if that question arose.

In Jenner v. Shope, supra, it was held that a contract for the sale of a partnership name used illegally by the plaintiff's decedent was itself illegal and could not be enforced. The case shows, if proof be necessary, that the use is illegal for all purposes, and, that being so, I think that Deutsch had no right to use the name upon his notices. It was not, therefore, the "name of the copyright proprietor," as intended by section 18. The plaintiff urged that such a doctrine would allow a state statute to control the copyright law; but when that law required copyright proprietors to affix their names it certainly intended only such names as they may lawfully use under the law of their domicile. It cannot be supposed that Congress intended to make that lawful in this instance within a state which the state made unlawful for every other purpose. Doubtless Congress might have the power to make such an enactment, but so to interpret this statute would presuppose a wanton purpose of discord. It seems to me wholly fanciful to suppose that Congress intended to permit the use of names which it was a crime under the state law to use.

Judge Shipman's decision in Scribner v. Allen (C. C.) 49 Fed. 854, upon which plaintiff chiefly relies, is not in point, because in that case the plaintiff's name was not illegal under the statute as it then existed. Section 1, chapter 262, Laws of 1886 (now section 22 of the Partnership Law). That law then provided and now provides that the name of a partnership should not contain the name of a partner who was not a member of the firm, and that, if the word "Company" was used, it should represent an actual partnership. The plaintiff's name in that case was Charles Scribner's Sons, and Charles Scribner was the person doing business. The word "Company" did not appear, and the name is therefore not within the statute in fact. Section 440 of the Penal Code was not then in existence, nor was section 363b of the old Penal Code. On the facts, therefore, the case does not apply, and Judge Shipman's language gives no reason for thinking that he had in mind any such defense as is here presented The name, "Charles Scribner's Sons," probably in fact was quite legal under the then existing law, which has been re-enacted into sections 20 and 21 of the present Partnership Law. The case came before Judge Shipman on demurrer, and all he decided was that the allegation of ownership was sufficient without setting up all the facts requisite under sections 20 and 21. In effect his decision was that the facts, if relevant at all, were only matter of defense.

For these reasons I think that the present point taken by the defendant is good and that no suit lies under section 12 under the notice of copyright in its present form. The result is that the bill will be dismissed upon the merits, with costs.