SAMMONS et al. v. LARKIN et al.
No. 596.

District Court, D. Massachusetts.
April 17, 1940.

Arthur Thad Smith, Jr., of Boston, Mass., and Robert V. Jones, and B. W. Carrington, Jr., both of Chicago, Ill., for plaintiff.

Stanley G. Barker and Thayer, Smith & Gaskill, all of Worcester, Mass., for defendant The Colonial Press, Inc.

Richard H. Field, Lloyd Ritvo, and Brenton K. Fisk, all of Boston, Mass., for defendant Thomas Larkin, III.

FORD, District Judge.

This suit seeks an injunction and damages for copyright infringement and is brought under the provisions of Title 17 U. S.C.A. §§ 1–63. A second count in the complaint for trade-mark infringement and unfair competition is dismissed on motion of the plaintiffs, as will appear later.

The plaintiffs are co-partners and citizens of Illinois. The individual defendant, Thomas Larkin, III, is a resident of Cambridge, Massachusetts, and does business under the firm name and style of Larkin, Roosevelt, & Larkin, Ltd. The Colonial Press, Inc., (hereafter called "Colonial") is a Massachusetts corporation located in Clinton, Massachusetts.

In the main, the defense is a denial of infringement.

### Findings of Fact.

1. One A. N. Marquis, doing business as A. N. Marquis Company, commenced publishing and selling biographical directories of living persons in 1898. Between that time and 1936 he and the A. N. Marquis Company, a corporation which purchased the business of A. N. Marquis in 1926, published and sold a series of biographical directories entitled "Who's Who In America", "Who's Who In New England", and "Who's Who in Chicago". On December 31, 1936, the plaintiffs acquired the business of the A. N. Marquis Company, the corporation, and up to the present time, as a partnership, have continued the business of publishing and selling biographical directories.

Between 1936 and 1939, the plaintiffs compiled, published, and sold directories with the following titles: "Who's Who in America, Volume 20, 1938"; "Who's Who in Chicago and Vicinity, Sixth Edition, 1936"; "Who's Who In New England, 1938"; "Who's Who In Pennsylvania, 1939"; "Who's Who In New Jersey, 1939"; "Who's Who In Maryland, 1939"; "Who's Who In West Virginia, 1939". All of these works were copyrighted under the copyright laws of the United States.

2. The book with which this suit deals is "Who's Who In New England, Volume 3", published in June, 1938, (hereafter called "In New England"). A certificate of copyright registration was duly issued on this work by the copyright office of the United States, dated June 6, 1938. Notice of copyright was duly printed in this publication.

3. In January, 1940, the defendant Larkin published the alleged infringing book, entitled "Who's Who In Massachusetts, Volume 1" (hereinafter called "In Massachusetts"). The defendant Larkin was the sole proprietor of Larkin, Roosevelt, Larkin, Ltd. The business was located in a small office at 30 Newbury Street, Boston, Massachusetts. There was only one permanent employee in the office, a woman. Larkin commenced doing business in 1937, at which time he conceived the idea of publishing "In Massachusetts." There was no evidence that up to that time he had any experience in the publishing business. In fact, he came out of college in April of 1937.

4. The book "In Massachusetts" was manufactured by Colonial and the manufacture included the printing, electrotyping, stitching, and binding. Colonial are book manufacturers and not engaged in the publication of books. It does the actual mechanical work involved in producing books after receiving manuscripts from publishers. Colonial was introduced to Larkin through the University Press, a printing concern located at Cambridge, Massachusetts. As a result of the introduction, Colonial contracted with Larkin for the manufacture of "In Massachusetts" on May 8, 1939. The contract called for 3,000 books for a lump sum price of $7,500. Out of this, Colonial agreed to pay the University Press a commission of $1,000.

5. Colonial commenced receiving the manuscript for "In Massachusetts" from Larkin a short time after May 8, 1939, and delivery of the books commenced December 6, of that year. The manuscript was received in the form of typewritten sheets containing biographical sketches. A total of 2,812 books were delivered to Larkin, the last of them on April 12, 1940.

6. On February 8, 1940, Colonial received from the plaintiffs written notice of alleged infringement. Printing was stopped by Colonial February 26. Between the latter date and April 12, 1940, Colonial delivered to Larkin between 1,500 and 2,000 books.

7. The evidence further showed that sometime in 1938, before "In New England" was published, the president of Colonial interviewed an agent of the plaintiffs in Chicago, Illinois, for the purpose of procuring the printing of "In New England". Colonial later submitted a bid for the printing but was unsuccessful. Further, it appeared that the president of Colonial had purchased a copy of "In New England" shortly after its publication in 1938.

8. Larkin testified that he secured his material for "In Massachusetts" from newspaper files, correspondence with prominent people in Massachusetts, publications, such as, "Who's Who In Law" and similar publications, year books, educational institutions, and educators. He testified that he was engaged in the preparation of "In Massachusetts" in the Fall of 1937 before the publication of "In New England". He stated he compiled a main list of about 15,000 names from his research up to June, 1938, and sent questionnaires to each one. He testified he sent out 50,000 letters in the preparation of his work. His method was to prepare, when the questionnaire was returned, a typewritten biographical sketch, which in turn was sent out to the subject for approval. When approval was received, it was sent to Colonial for printing. "In Massachusetts" contained about 7,700 biographical sketches. "In New England" contained about 12,445 sketches. Of the 7,700 sketches in "In Massachusetts," 4,051 appear in "In New England". Larkin further testified he wrote very few of the biographies himself; that at least 3,800 of them were written by a woman assistant, who appeared at the trial. Outside assistants compiled the remainder, according to Larkin. None of the latter appeared at the trial. No sketch appeared in "In Massachusetts" upon which the approval of the person involved had not been secured. Larkin further testified that in compiling his work questionnaires were received from about 6,000 of the 7,700 from which biographies were made up and the other 1,600 or 1,700 biographies in "In Massachusetts" were not compiled from questionnaires, but from material secured from outside sources, including "In New England".

9. The plaintiffs, in order to prove infringement, showed they had made a comparison of nearly 300 pages of "In Massachusetts" with the corresponding alphabetical pages of "In New England". The evidence showed that fifty-three of the biographies in these compared pages are identical with the corresponding biographies in "In New England", except for differences in style and punctuation, and sixty-one biographies in the compared pages of "In Massachusetts" contain peculiarities

of expression identical with those in "In New England".

10. Further, the evidence showed that at least thirteen of the 114 biographies referred to in the preceding paragraph published in "In Massachusetts" contain errors identical with those found in "In New England". These were errors of spelling, abbreviation, and punctuation.

11. The plaintiffs produced from the files of Larkin the biographies of nine persons which were identical, except for changes in style, with the corresponding biographies in "In New England". These biographies in Larkin's files were on typewritten sheets on which the changes had subsequently been made in ink. With these changes in style they finally appeared in "In Massachusetts". The files of six of these biographies contained no questionnaires whatsoever. In one file, where a questionnaire had been returned, the biographical sketch in "In Massachusetts" contained material appearing in "In New England" which did not appear in the subject's questionnaire and omitted material that appeared in the subject's questionnaire but which was omitted in "In New England".

12. Larkin produced no documentary evidence or evidence of the existence of any such from which it could be reliably found that he had resorted to original sources for his information.

13. Larkin and Colonial opened a joint account in a bank in Boston in which all the receipts from the sale of "In Massachusetts" were deposited and from this account Colonial received payment for its work in printing Larkin's work.

### Larkin's Infringement.

These findings of fact present, first, the question, have the plaintiffs sustained the burden of proving the defendant Larkin copied their work to such an extent as to constitute infringement?

■■ One of the most significant evidences of infringement is identity of errors. Of course, this is circumstantial evidence, but it is of the convincing sort. Callaghan et al. v. Myers, 128 U.S. 617, 662, 9 S.Ct. 177, 32 L.Ed. 547; W. H. Anderson Co. v. Baldwin Law Pub. Co., 6 Cir., 27 F.2d 82, 87. Immediately upon the discovery of similar errors in both works, the burden falls heavily upon Larkin, whose publication was later in time, to explain their presence. Encyclopaedia Britannica Co.

v. American Newspaper Ass'n et al., C.C., 130 F. 460, 464. Larkin was at an entire loss to account for at least thirteen identical errors and this failure leads to the conclusion that the biographies where these errors appeared were copied from "In New England". In fact, it does not seem that any other conclusion is possible.

■ In addition to the identical errors, the identical biographies and peculiarities that were found in both works constitute strong probative evidence that the defendant Larkin had, to a substantial degree, unlawfully appropriated the plaintiffs' work. This he cannot do and avoid infringement. The presence in his files of identical biographies with no questionnaires which contained changes subsequently made in ink by him and their appearance later in "In Massachusetts" is damaging evidence of copying.

The identical biography referred to in paragraph 11, in which material was added that was not in Larkin's returned questionnaire and omitted when it did appear in Larkin's returned questionnaire, is strong evidence of copying. It shows he did not follow his questionnaires as he said he did. The six identical biographies where Larkin's files contained no questionnaires indicate plagiarism.

Larkin's testimony as to the sources of his 1,600 or 1,700 biographies concerning which he received no questionnaires was not convincing. The data upon which these biographies were based was not produced by Larkin. It is fairly inferable that he would have some notes, some records, or results of his efforts in securing material from original sources, if he had resorted to them. His admission that some of his material in these biographies came from "In New England" was significant.

Although Larkin strongly stated he went to original sources for his material, the evidence in this case belies that fact. He produced no documentary evidence whatsoever to show upon what his original list, as he testified, of 15,000 names was based. There was a noticeable lack of records such as he would possess if he did the research work he testified he did. He did have a great many subjects in "In Massachusetts" the plaintiffs did not have in "In New England", but outside of his mere declaration, there was no evidence he went to original sources to get the material for these biographies.

I am perfectly satisfied that a comparison of the two works shows a substantial and improper appropriation by the defendant Larkin of the plaintiffs' work and effort expended in compiling "In New England". In fact, I did not, at the time of hearing the case and observing the witness, have the slightest doubt about it. I find that Larkin's "In Massachusetts" was substantially copied from "In New England" and, consequently, he is guilty of infringement. Frank Shepard Co. v. Zachary P. Taylor Pub. Co., 2 Cir., 193 F. 991.

### Colonial's Infringement.

■ The next question presented is whether Colonial infringed the plaintiffs' work. There was no dispute it printed "In Massachusetts". It was stated in American Code Co., Inc., v. Bensinger et al., 2 Cir., 282 F. 829, 834: "It is established that the one who prints an infringing work is an infringer". See Belford, Clarke & Co. v. Scribner, 144 U.S. 488, 12 S.Ct. 734, 36 L.Ed. 514; Amdur, "Copyright Law and Practice", Chapter 28, Section 1; 18 C.J.S., Copyright and Literary Property, § 121; 17 U.S.C.A. § 1(a). There is no question in view of the authorities and the language of the Act that a printer of an infringing work is an infringer.

■ The fact that Colonial was an innocent infringer does not help it to avoid liability. Intention is immaterial, if infringement otherwise appears. Meccano, Ltd., v. Wagner et al., D.C., 234 F. 912. "In New England" was copyrighted, the statutory notices were given as required by Sections 9, 18, and 19 of the Copyright Act, 17 U.S.C.A. §§ 9, 18, 19. As a result, the plaintiffs' rights in the copyright were absolute. When notice of copyright is published, the duty is upon all and sundry to know the fact concerning it. Innocence of intent to invade that right is no excuse for actually doing so. Douglas et al. v. Cunningham et al., 294 U.S. 207, 55 S.Ct. 365, 79 L.Ed. 862; Buck et al. v. Jewell-La Salle Realty Co., 283 U.S. 191, 198, 51 S.Ct. 410, 75 L.Ed. 971, 76 A.L.R. 1266; Johns & Johns Printing Co. et al. v. Paull-Pioneer Music Corp., 8 Cir., 102 F.2d 282, 283; Haas v. Leo Feist, Inc., et al., D.C., 234 F. 105; Gross et al. v. Van Dyk Gravure Co., 2 Cir., 230 F. 412, 414; Reed et al. v. Holliday, C.C., 19 F. 325, 327; Advertisers Exchange, Inc., v. Laufe, D.C., 29 F.Supp. 1.

■ Nor do the facts sustain the contention of Colonial that although it might be severally liable to the plaintiffs, it was not jointly liable with Larkin for the infringement and could not be sued with Larkin. We are concerned here with the same series of transactions and there are questions of law and fact common to both defendants. Rule 20(a), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, justifies the joinder of defendants under these circumstances. This rule and the rules in general command economy of procedure. The facts also justify a joint action. Larkin contracted with Colonial to do the work. It was the combined effort of Colonial and Larkin that placed the infringing book upon the market. But for Colonial, Larkin would have no infringing book. All who unite in an infringement are liable for damages. Belford, Clarke & Co. v. Scribner, supra; Ted Browne Music Co. v. Fowler, et al., 2 Cir., 290 F. 751, 754; American Code Co., Inc., v. Bensinger et al., supra; Gross v. Van Dyk Gravure Co., supra; Schellberg et al. v. Empringham et al., D.C., 36 F.2d 991, 995, 996; and Fleischer Studios, Inc., et al. v. Ralph A. Freundlich, Inc., D.C., 14 F.Supp. 401.

### Damages

No evidence of actual damage was offered by the plaintiffs.

■ Larkin sold 2,280 volumes of his work for $18,795. He paid Colonial $6,517.01 for printing. There is no dispute about these facts. However, the amount of Larkin's costs in connection with the publication and sale of the work in addition to the printing are not too clear. Mathematically correct amounts cannot be arrived at. He had no record of costs. He produced no books of account. He testified, from memoranda compiled by himself, that he spent $1,260 for mailing 50,000 circulars. He produced no records to substantiate this expenditure. He stated he estimated it from the number of stamps he bought about this time. There was nothing exact about this. However, there is hardly any doubt that he sent out about 15,000 letters, and, in some instances, he circularized subjects three times. (See Richardson letter, plaintiffs' exhibit 4.) The best I can make of the item of expense to be allowed for mailing is to allow postage for 30,000 letters at an average cost of

654

2⅓ cents each, or $700 for the whole. He testified he paid 15 cents for each biography that was compiled. This seems to be a fair charge. There were 7,700 biographies in his work and a total cost of $1,155 can be allowed in this connection. Telephone costs of $148 can be allowed as the item of $500 for stationery. The evidence of rent paid was sketchy, but I think on the whole he had some expense for rent and $510 is a fair allowance. The defendant Larkin testified that salaries amounted to $4,151. That sum as a whole cannot be allowed without some substantiation and the sum of $1,500 is allowed for clerk hire for the one employee who appeared before me at the trial. The remainder of the sum of $4,151 seems to be compensation for the defendant himself. He cannot profit from his wrong here. What he took was a part of the profits. These he must account for. Sheldon et al. v. Metro-Goldwyn Pictures Corp et al., 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825; 17 U.S.C.A. § 25(b).

The evidence showed that of the 7,700 biographies in "In Massachusetts", about 4,000 were in "In New England". There was a commingling of gains in Larkin's book but he introduced no evidence to show what portion of the profits from his book were due to his own efforts. "Where there is a commingling of gains, he must abide the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him." Sheldon et al. v. Metro-Goldwyn Pictures Corp., et al, supra, 309 U.S. page 406, 60 S.Ct. page 687, 84 L. Ed. 825. See Belford, Clarke & Co., v. Scribner, supra; and Callaghan et al. v. Myers, supra. Thus, under the circumstances, no portion of the profits can be allowed in Larkin's favor for any contribution made by his own labor to "In Massachusetts". I must say in passing, I do not believe that all the profits received by Larkin were attributable to material copied from the plaintiffs' work, but the difficulty is the defendant made no attempt to show the extent of his contribution so that the profits could be separated. Cf. Sheldon et al. v. Metro-Goldwyn Pictures Corp. et al., supra.

In summary, I find Larkin received profits of $18,795; that his proved costs amounted to $11,030.01; and that his net profit was $7,664.99. He must account

and is liable for this amount to the plaintiffs. 17 U.S.C.A. § 25(b).

As to Colonial. Larkin paid it $6,517.01. I find that Colonial's direct cost for labor was $2,836.96; for materials $1,588.24; a total of $4,425.20. Colonial is obligated to pay University Press $994, commission for forwarding the job. Up to this point, Colonial shows a gross profit of $1,097.81.

The president of Colonial testified that an allocation of overhead expense in the amount of $2,936.25 should be made. He arrived at this figure by determining the relationship by percentage of the total expense of Colonial for productive labor for the year 1939 to the total administrative expense for the same year. Overhead ran 103.5% times labor. 103.5% of $2,836.96— the total labor cost of the job of printing the infringing book—is $2,936.25. This amount it allocated as overhead to the total cost of the job. The figures presented by Colonial to prove this item of cost were taken directly from its books, and although one could be a little skeptical about their accuracy, no evidence was presented upon which I could predicate a finding they were wrong. There are times when estimates for jobs are too low and the margin allowed for profit too thin. This case may be one of these as far as the evidence showed. In any event, I cannot find otherwise on the evidence presented. Colonial normally allowed 10% for profit. The estimate for the cost of the job here was too low to secure such a profit. It would have been better if Colonial had shown why it failed to allow for profit on the job. This would have presented a clearer picture. However, no evidence was introduced by the plaintiffs to show that Colonial's figures or that its method was incorrect in arriving at the overhead charged to the job. The method used here to charge overhead is generally recognized as correct. The mere contention by the plaintiffs that the amount charged is too large without presenting any concrete evidence upon which the court can find it to be, is not helpful. I do not believe the president of Colonial misstated the facts. If the plaintiffs had considered this item of cost at all they could have asked for Colonial's books and examined them in detail in order to disprove the defendant's contentions. This they did not attempt to do. There is no contention that some overhead could not be

·distributed to the cost of the job. Cf. Sheldon et al. v. Metro-Goldwyn Pictures Corp. et al., supra. To be sure, the Copyright Act states a defendant shall prove every element of cost which is claimed. I find Colonial has sustained the burden imposed on it in connection with the items of cost discussed. It realized no profits from its venture.

Colonial's net bill to Larkin amounted to $8,091.93. Colonial's total cost of the job was $8,355.45. It made no profit for itself, even if Colonial receives its balance due from Larkin.

With these facts, to what extent is Colonial liable to the plaintiffs? The plaintiffs have suffered no recoverable damage for which both defendants would have been severally and jointly liable as joint tortfeasors. Haas v. Leo Feist, Inc., D.C., 234 F. 105, 106; Gross et al. v. Van Dyk Gravure Co., supra; and Fleischer Studios, Inc., v. Ralph A. Freundlich; Inc., supra.

Colonial is not liable for the profits received by Larkin as contended for by the plaintiffs. The infringer is liable for his own profits, not for the profits made by a co-defendant under the facts and circumstances of this case. Joint tortfeasors are severally and jointly liable for damages, to be sure, but an accounting of profits required by the Copyright Act is an equitable remedy and must be according to equitable principles. It would be unjust in this case to compel Colonial to return to the plaintiffs profits made by Larkin in which Colonial at no time shared. To say Larkin and Colonial here were jointly liable for Larkin's profits would be tantamount to constituting Colonial, because of its appropriation of the plaintiffs' property, a trustee of profits it never received nor in which it was entitled to share as a partner through any arrangement with Larkin. Cf. Belford, Clarke & Co. v. Scribner, supra. The conclusion I reach is analogous to the rule in patent infringement accounting where each infringer must account for his own profits. International Radio Tel. Co. v. Atlantic Communication Co., 2 Cir., 290 F. 698, 701. Cf. dictum in Gross et al. v. Van Dyk Gravure Co., supra. The case of Belford, Clarke & Co. v. Scribner, supra, cited by the plaintiffs, is not applicable because in that case the court found the co-defendants shared the profits and were partners. There was no evidence here upon which any finding of partnership could properly be found.

In this view, that portion of the Copyright Act is applicable to Colonial which provides that such damages are recoverable from the infringer as shall appear to the court to be just within the minimum-maximum limits prescribed by Section 25(b) of the Act.

I realize Colonial delivered a considerable number of books to Larkin after receiving actual notice of infringement. However, I cannot bring myself to believe that this was in defiance of the plaintiffs' rights or that Colonial was attempting consciously to aid in infringement. I am of the opinion, from the evidence, that Colonial regarded it was within its rights. It received the job from a well known printing house. It was justified in placing considerable reliance upon the source from which it obtained the work it did in connection with the infringing publication. I conclude that Colonial should not be penalized too severely for its conduct. The fact that a joint account was opened with Larkin is not pregnant with too much significance. Colonial did not receive any of the profits, as such, from Larkin. What Colonial was trying to do, I deduce, after hearing all the testimony, was to protect its bill for work done. The evidence in the case and a proper inference to be drawn from it indicated that Larkin was no financial colossus.

With Larkin accounting for his profits; an injunction issuing under the provisions of Section 25(a) of the Act; a destruction of all copies of the work in existence together with all the plates; and a reasonable attorney's fee against Larkin, I believe an award of the minimum amount of damage allowed by Section 25(b) against Colonial will be adequate.

Finally, judgment will be entered for the plaintiffs in the sum of $7,664.99, with costs, against Larkin; in the sum of $250, with costs, against Colonial; and an attorney's fee of $1,500 awarded as part of the costs against Larkin alone.

In addition, an injunction will issue as prayed for by the plaintiffs with an order that the defendants deliver up for destruction all infringing copies, as well as all plates, molds, and other means for making such copies. Section 25(d) of the Act.

The plaintiffs' motion to dismiss the second count of the complaint as to

both defendants is allowed with prejudice and without costs. Rule 41(a) (2), F.R.C. P. The plaintiffs had ample opportunity to present their case on this count and I believe the litigation should end.

The plaintiffs will prepare a form of judgment in accordance with this opinion and submit it to me for approval and entry.