## DE ACOSTA v. BROWN et al.

No. 82.

Circuit Court of Appeals, Second Circuit.

Dec. 13, 1944.

Milton Diamond, of New York City (Diamond, Rabin & Mackay and Henry Turin, all of New York City, on the brief), for defendant-appellant Brown.

Alfred H. Wasserstrom, of New York City (McCauley & Henry, of New York City, on the brief), for defendant-appellant Hearst Magazines, Inc.

Carl J. Austrian, of New York City (Austrian & Lance and E. Robert Marks, all of New York City, on the brief), for plaintiff-appellee.

Before L. HAND, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Plaintiff has recovered a judgment below based on literary property in the "heart interest" which she has added to the life of a historical character with the avowed intent of making a biographical screen play palatable to the movie audiences of America. The historical character is that of Clara Barton, founder of the American Red Cross, who lived a long and very useful life from 1821 to 1912, in which, however, most of her biographers have found no love romance, though a few have hinted somewhat vaguely at the possibility, without personalizing the hero. Plaintiff completed her screen play of the life of Clara Barton, entitled "Angel in Service," on September 1, 1940, and registered it on September 9, 1940, at the offices of the Screen Writers Guild in Hollywood, California, but did not have it copyrighted or published, intending to sell it for production as a motion picture. In this play plaintiff creates a lover of Clara Barton, to whom she gives the name of Tom Maxwell (the surname, as she testified, occurring to her as she used the well advertised coffee of that name); she has Maxwell eventually going to California, where he dies, bequeathing to Clara a legacy in gold dust amounting to $10,000, as shown in a letter full of pathos sent to her by her brother. In addition to this incident plaintiff developed other fictionalized happenings at this same early period of Clara Barton's life, namely, her controversy with the school board in Bordentown, New Jersey, led by the lawyer Elisha Richards, more or less as the "heavy" or villain; her leaving of Bordentown in consequence and her work as a clerk in the Patent Office in Washington, where she was instrumental in ferreting out misconduct and fraud; and her meeting with former pupils, as soldiers, while she was serving as a Civil War nurse. In fact, Clara Barton did teach school at Bordentown and did later work in the Patent Office, where she was instrumental in stamping out fraud; but again the development of the incidents and the creation of specific named persons to participate in them were entirely the plaintiff's work. And while the sources refer to Clara's finding former pupils on Civil War battlefields, yet the nature of the incidents and the pupils involved were quite different in plaintiff's version.

Defendant Beth Brown, a well known and highly prolific writer of feature columns, short stories, novels, and songs, was also interested in the life of Clara Barton for movie purposes; and prior to the time when plaintiff's screen play became available, she, too, had prepared a screen play, which, while it had an added love interest, was significantly different from the characters and story later used by her. Thereafter, however, and by September, 1941, she completed an unpublished book entitled, "Dedicated to Life"; and in the March, 1942, issue of the Cosmopolitan Magazine, defendant Hearst Magazines, Inc., in its department entitled "The Nonfiction Book Digest," published extracts from it, which it termed "high lights from a forthcoming biography," under the title, "War Nurse; The Biography of Clara Barton. By Beth Brown."

In the unpublished book there is reproduced in substantially similar form the romance with Tom Maxwell, even to the point of reproduction of the letter supposed to have come from Clara's brother announcing the death of her lover—so similar in form and wording as to be strong evidence of copying. There is also reproduced the controversy at the Bordentown school, with the same persons in opposition to Clara and the same three identified school children who had been created by the plaintiff. Also is related her work in the Patent Office and her discovery of misconduct there, most significantly involving the clerk with the same unusual name, Eyra Jenks, found in plaintiff's work. Plaintiff testified that she had intended naming this character "Ezra" (as a "strong" New England name she had previously used in a play on New England), but that her typist misread her writing and made it Eyra, and she let it stand as she did not want to go to the expense of a retyping. All in all, some seven persons created by the plaintiff appear in the same characters and the same scenes with unsubstantial variations, except that Arthur Holt has become Arthur Hold, obviously the same pupil in both versions, who appears

later as a Civil War soldier in both, though with a slight transposition of incidents.[1]

 These similarities, which are more extensively set forth and discussed by the district judge in his opinion, Acosta v. Brown, D.C.S.D.N.Y., 50 F.Supp. 615, and his findings of fact, are too pointed to justify any other conclusion than that of copying. Wilkie v. Santly Bros., 2 Cir., 91 F.2d 978, 979, certiorari denied Santly Bros. v. Wilkie, 302 U.S. 735, 58 S.Ct. 120, 82 L.Ed. 568, affirmed 2 Cir., 94 F.2d 1023. In addition, plaintiff proved the possibility of access through one Markey, an agent to whom she submitted her work with an eye to its sale, who thereafter, as the evidence showed, was consulted by defendant Brown as to research details of her work, though she failed to call him as a witness. The fact that the matter involved concerned only a small and an early part of Clara Barton's life and only a portion of defendant Brown's book may affect the amount of recovery, but does not prevent liability. The same observation may be made as to defendant Hearst, who reprinted only a small portion of the book, but did cover the Tom Maxwell incident quite thoroughly, including the pathetic death announcement from her brother. Particularly in view of the importance of the love interest to the movie trade, this copying cannot be considered insignificant within the meaning of cases such as Mathews Conveyer Co. v. Palmer-Bee Co., 6 Cir., 135 F.2d 73, 84, 85. See Chicago Record-Herald Co. v. Tribune Ass'n, 7 Cir., 275 F. 797, 799; Callaghan v. Myers, 128 U. S. 617, 666, 9 S.Ct. 177, 32 L.Ed. 547. The finding of plagiarism against both defendants must therefore stand.

 Defendants contend, however, that this material deals with the life of a public character and is therefore itself public; but clearly the use of plaintiff's material here goes beyond such permitted use of historical matter. It seems quite clear that original treatment of the life of a historic character, like such treatment of any material even in the public domain, is entitled to protection against appropriation by others. Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 81 F.2d 49, 53, 54, certiorari denied Metro-Goldwyn Pictures Corp. v. Sheldon, 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392; Stodart v. Mutual Film Corp., D.C.S.D.N.Y., 249 F. 507, 509, 510, affirmed 2 Cir., 249 F. 513; Stevenson v. Fox, D.C.S.D.N.Y., 226 F. 990; Banks v. McDivitt, C.C.S.D.N.Y., Fed.Cas.No. 961, Shipman, J.; Folsom v. Marsh, C.C.Mass., Fed.Cas.No. 4,901, Story, J. Defendants assert that there can be no literary property merely in proper names, and thus seek to discount the striking similarity here even to the misspelling of the name "Ezra." There is, of course, no arbitrary rule to such effect; use of a well known proper name may obviously signify little under many circumstances; in others, as here, it may assist to a conclusive demonstration of copying otherwise indicated. Stephens v. Howells Sales Co., D.C.S.D.N.Y., 16 F.2d 805, 806.

 The injunction, therefore, and the judgment for an accounting of profits against both defendants[2] and for damages against defendant Brown are clearly correct. There remains, therefore, only the question of damages against Hearst, in view of the court's finding that its copying was "innocent." In Barry v. Hughes, 2 Cir., 103 F.2d 427, certiorari denied 308 U.S. 604, 60 S.Ct. 141, 84 L.Ed. 505, in dealing with a copyrighted play, this court expressed a caveat on this issue, saying, "Laying aside a possible action for unjust enrichment, or for an injunction after discovery, we should hesitate a long while before holding that the use of material, apparently in the public demesne, subjected the user to damages, unless something put him actually on notice." But the court made it clear that it was leaving the point "for decision when it arises."

So far as copyrighted material is concerned, the authorities are too conclusive to allow of doubt. Indeed, the inference from the copyright law itself would seem to be most direct; for, while it makes significant distinctions in certain instances based on innocent or willful infringement, as the case may be, it does not do so in the general provision for award of profits and actual damages, or those statutory sums allowable in the court's discretion in

---

[1] Arthur in defendant's version taking the place of Eddie Johnson in plaintiff's version, wherein Arthur appears as the wounded soldier.

[2] Defendant Hearst objects that the decree makes it liable jointly and severally with Brown for the latter's profits. We do not so read the decree; but in any event, that is a matter for determination on entry of the final decree. Cf. Sammons v. Colonial Press, 1 Cir., 126 F. 2d 341.

lieu of actual damages. 17 U.S.C.A. § 25 (b); cf. ibid. §§ 20, 28.[3] Hence we have the classic statement of Brandeis, J., in Buck v. Jewell-La Salle Realty Co., 283 U. S. 191, 198, 51 S.Ct. 410, 411, 75 L.Ed. 971, 76 A.L.R. 1266, "Intention to infringe is not essential under the Act," and the important decision in Douglas v. Cunningham, 294 U.S. 207, 55 S.Ct. 365, 79 L.Ed. 862, holding erroneous the action of the Circuit Court of Appeals, 1 Cir., 72 F.2d 536, 539, in cutting the allowance by the District Court of the statutory maximum of $5,000 to the minimum of $250 because of the innocence of the defendant newspaper publisher and its employee. See also L. A. Westermann Co. v. Dispatch Printing Co., 249 U.S. 100, 39 S.Ct. 194, 63 L.Ed. 499, reversing 6 Cir., 233 F. 609, and requiring the award of at least the minimum for each publication by a newspaper of advertising reproducing different copyrighted design sketches illustrative of fall styles in women's hats and gowns.

Numerous lower court decisions are of the same tenor. Thus it appears usual to hold an innocent publisher of a copyrighted book liable, as in Gross v. Van Dyk Gravure Co., 2 Cir., 230 F. 412, 413, affirming the judgment of L. Hand, D. J., therein quoted, or in Sammons v. Larkin, D.C.Mass., 38 F.Supp. 649, which was affirmed on appeal as to the publisher, but reversed for inadequate allowance for the plaintiff, in Sammons v. Colonial Press, 1 Cir., 126 F.2d 341. In American Press Ass'n v. Daily Story Pub. Co., 7 Cir., 120 F. 766, 768, 769, 66 L.R.A. 444, appeal dismissed 193 U.S. 675, 24 S.Ct. 852, 48 L.Ed. 842, the court states that it is not material that the infringer in publishing the copyrighted story was not aware that the story was so protected, for "it published it at its peril, and ignorance will not avail," making use of the analogy of "title to a horse lost by the stealing of it, or by the unlawful sale of it to a stranger." And the dissenting opinion, which went on a different point—the scope of a granted license—specifically accepted the view that innocence was not a defense, and that title to copyright was not lost by theft or piracy of the manuscript. Among other cases may be cited Norris v. No-Leak-O Piston Ring Co., D.C.Md., 271 F. 536, affirmed 4 Cir., 277 F. 951; Johns & Johns Printing Co. v. Paull-Pioneer Music Corp., 8 Cir., 102 F. 2d 282; Chappell & Co. v. Costa, D.C.S. D.N.Y., 45 F.Supp. 554; and the cases in the margin.[4] This body of authority shows a unanimity of view which is impressive; we cannot find in it any suggestion of a distinction that one type of innocent copying is less "direct" than another or that innocent copying by newspapers and magazines acquires a protection not accorded to book or gravure printing, in such cases as the Sammons and Gross cases, supra. And the textwriters appear to be quite in accord. Drone on Copyright, 1879, 403, 404, 638; Weil, American Copyright Law, 1917, 172, 351, 401; 2 Ladas,

---

[3] 17 U.S.C.A. § 25(b) provides a schedule of charges per infringement which may be used by the court in allowing "just," in lieu of "actual," damages, but within the limits of $250 to $5,000, except for infringements occurring after actual notice; but it contains also some special limitations, for certain particular cases, including infringement by a maker of motion pictures in the one case of an undramatized or non-dramatic work and in the other of a copyrighted dramatic or dramatico-musical work where (in each case) the infringer shows that he was not aware that he was infringing and the infringement could not have been reasonably foreseen. Sec. 20 protects the copyright proprietor from accidental omission of the copyright notice from a particular copy or copies except "against an innocent infringer" misled thereby, who may be given an allowance for "his reasonable outlay innocently incurred" if the proprietor receives a permanent injunction. Sec. 28 makes it a misdemeanor for any one "willfully and for profit" to infringe a copyright. Thus, had innocent copiers been already immune, there would have been no occasion for affording them protection against copyright proprietors who had misled them by lack of copyright notice, § 20, or for granting the limitations specified in § 25(b) for makers of motion pictures.

[4] Haas v. Leo Feist, Inc., D.C.S.D.N.Y., 234 F. 105; Altman v. New Haven Union Co., D.C.Conn., 254 F. 113; M. Witmark & Sons v. Calloway, D.C.E.D.Tenn., 22 F.2d 412; Norm Co. v. John A. Brown Co., D.C.W.D.Okla., 26 F.Supp. 707; Famous Music Corp. v. Melz, D.C.W.D. La., 28 F.Supp. 767; Advertisers Exchange v. Laufe, D.C.W.D.Pa., 29 F. Supp. 1; R. R. Donnelley & Sons Co. v. Haber, D.C.E.D.N.Y., 43 F.Supp. 456; Freudenthal v. Hebrew Pub. Co., D.C.S. D.N.Y., 44 F.Supp. 754; Shapiro, Bernstein & Co. v. Veltin, D.C.W.D.La., 47 F.Supp. 648.

412

The International Protection of Literary and Artistic Property, 1938, 816; Amdur, Copyright Law and Practice, 1936, 685; Ball on Copyright and Literary Property, 1944, 329–332.[5] This result is not surprising. As Drone pointed out so many years ago, the protection accorded literary property would be of little value if it did not go against third persons, or if, it might be added, insulation from payment of damages could be secured by a publisher by merely refraining from making inquiry.

Should a different rule be applicable to uncopyrighted material? That would leave the issue very narrow, indeed, so narrow that nonliability would hardly make an appreciable difference to publishers in the conduct of their business, though it might occasionally rest heavily on a particular author. But generally speaking, damages will be difficult of proof and the amount of recovery is likely to be small. Nor does the rationale for such a distinction seem sound. It is suggested that recovery is contrary to the general doctrine of torts, apparently on the view that liability and damage should be limited to such as can be foreseen and avoided. But "torts" is a broad field of law; and while the doctrine may apply to negligence, it does not apply to conversion or appropriation. Cf. Restatement, Torts, 1934, §§ 222, 244, with § 289. Here the analogy of the cases has always been that of the conversion of literary property; and, as in the American Press case cited above, that analogy here is complete to justify recovery as against even an innocent copier. In England the law is settled completely and definitely on this very basis, in a clear-cut decision discussing the earlier authorities, Mansell v. Valley Printing Co., [1908] 2 Ch. 441, 1 B. R.C. 187, 15 Ann.Cas. 133, affirming [1908] 1 Ch. 567.[6] So far as we can find, there is no authority suggesting the contrary; and Drone and Weil both agree, as cited supra, that the rule extends to uncopyrighted literary property.[7] This case well illustrates the dangers to authors if a different rule were to be established. For the finding of innocence of Hearst is based upon two factors only, namely, that Brown the infringer assured the Cosmopolitan editor of the research that she had done on the matter, and that the reputation of Brown was known to the editor—a reputation, however, distinctly other than in the field of historical research. And if it be suggested that other more effective means of inquiry are not conveniently available to publishers, then that seems an additional reason for not depriving authors so easily of the fruits of their labors.

Judgment affirmed.

L. HAND, Circuit Judge (dissenting).

I agree in all that my brothers are deciding and in all they say, except as to the liability for damages of the Cosmopolitan Magazine. The chances are slight that these will be substantial, and I should have been silent, were it not that we are, in my opinion, committing ourselves to a doctrine which is wrong in theory, which the cases do not require us to adopt, and which imposes a risk upon publishers that is likely to prove an appreciable and very undesirable burden upon the freedom of the press. It is universally agreed that copyright—I do not distinguish "literary prop-

---

[5] In England and Canada, by statute, remedy may be limited to an injunction if the copyright is not known, and there was reasonable ground for such lack of knowledge. Fox, Canadian Law of Copyright, 1944, 333, 458–461; Bowker, Copyright—Its History and Its Law, 1912, 130, 378.

[6] The opinion of Swinfin Eady, J., below contains a complete résumé of the authorities, e. g., Prince Albert v. Strange, 2 De G. & S. 652, affirmed 1 Macn. & G. 25, 1 Hall & Tw. 1, cited also on the appeal, where the three lord justices all gave similar opinions, well epitomized by the statement of Farwell, L. J.: "It is said that it is hard on the defendant company, but it is no greater hardship on them than on any other innocent person who buys a stolen article in good faith but not in market overt, and it is at least as hard on the plaintiff to lose his property, if it is (as in my opinion it is) in every sense of the word his property." [1908] 2 Ch. at page 448.

[7] Defendants cite a quotation in Fendler v. Morosco, 253 N.Y. 281, 292, 171 N. E. 56, from Birrell, Copyright in Books, 169, on the extent of property in ideas which does have a statement that a literary larcenist must do more than filch ideas, etc., and must have a felonious intent; but as the context shows, the court was obviously using the quotation for its earlier, rather than its later, part. This portion of the Fendler case is quoted to sustain infringement in Casino Productions v. Vitaphone Corp., 163 Misc. 403, 295 N.Y.S. 501.

erty"—grants to an author only a monopoly of making and selling copies of his work; for this we need indeed look no further than to section one of the Copyright Act itself. I agree that, when a person directly copies a work he invades that monopoly, and makes himself absolutely liable, however little he may know that it is not in the public demesne. Further, I agree that when one copies a copy, he copies the original, even though he supposes that the copy —his own immediate source—is itself an original: he has in fact made use of the unknown original as his source, however unwittingly. Indeed, were this not true, it would be impossible to hold as an infringer one who used as his source even that which he knew to be a copy; at least unless the copy which he used was itself an infringement, when perhaps he might be held as a confederate.

However, it by no means follows that he who copies a copy, supposing it to be an original, although he has in fact invaded the author's monopoly, is liable as an infringer. To hold him when he has directly used the author's work as his source is one thing; he intends to copy what he has in fact copied, and he takes his chances of his right to do so, as I have just said. But when he supposes that what he has copied is an original, he has not intended to do, and does not suppose he is doing, that which alone is the wrong—copying the author's work. He may of course have such notice as charges him with knowledge that he is doing so, and he will then be liable; but the plaintiff at bar did not fasten such a notice upon the Cosmopolitan Magazine; and in my opinion she had the burden of so doing. Ordinarily an act does not become a wrong, when to make it so, one must resort to consequences arising from it in the actual sequence of events which reasonable persons would not anticipate. True, once a man is found to have committed a wrong, the law does at times hold him for consequences which he could not anticipate; but that is another matter. I can see no reason why the ordinary rule of liability for torts should not apply to copying a copy; and I see very strong reasons why it should, as I shall show. I accept the analogy of conversion; it is true that if, for instance, I carry off as mine another's watch in my bag, it is no excuse that I think it mine. However, I do not convert it, whatever acts of dominion I exercise over my bag, if I do not know, or am not chargeable with notice, that there is a watch in the bag, though I may have equally denied the owner's right. Restatement of Torts § 222 Comment (d) "Necessity of Intention," Comment (d) (sic) "Character of Intent Necessary."

This distinction which I seek to make is certainly not formal, or legalistic; it entails momentous results; for, unless some such limitation is imposed, an indefinite regress of liability emerges. He becomes unconditionally liable, who copies the copy of a copy, or the copy of a copy's copy, and so on; no matter how far we must go to reach the eventual author. When one considers that for infringement it is not necessary to reproduce the work in ipsissimis verbis; but that it is enough to take the substance of its "expression," as distinct from its "ideas," the resulting liability becomes unique in severity, and one, against which no degree of care will forfend. That it may prove, as I have suggested, an appreciable incubus upon the freedom of the press, appears to me by no means far-fetched. If my brothers are right, a publisher must be prepared to respond in damages to any author who can prove that the publisher has incorporated, however innocently, and at whatever remove, any part of the author's work. If that possibility is to hover over all publications, it would, I believe, be a not negligible depressant upon the dissemination of knowledge.

By far the greater part of those copious citations which my brothers' industry has gathered, touch the liability of one who directly, though innocently, copies the author's work; they do not help us to a decision here. So far as I can find, the point has been dealt with in only three, and I agree that those bear them out. The point was squarely decided in American Press Association v. Daily Story Publishing Co., 7 Cir., 120 F. 766, 66 L.R.A. 444, although, with a little doubt, I read the opinion of Grosscup, J. as dissenting on this point. The English Court of Appeal held the copier liable in Mansell v. Valley Printing Co. (1908), 2 Ch. 441, affirming Swinfin Eady, J. in (1908), 1 Ch. 567. In Norris v. No-Leak-O Piston Ring Co., D.C., 271 F. 536, Rose, J. assumed without any discussion that the copier infringed; but, although the Circuit Court of Appeals for the Fourth Circuit affirmed his judgment 277 F. 951, this point does not appear to

have been even raised. In Haas v. Leo Feist, Inc., D.C., 234 F. 105, 106, a publisher had employed one, Piantadosi, "as a casual composer of melodies" which it published, after they had been properly prepared by another employee. Piantadosi copied the melody of a song from the plaintiff, the defendant innocently published it, and I held the publisher liable for damages. That still seems to me right, for the defendant, being Piantadosi's employer to provide it with melodies, was liable for his torts. These decisions do not form so impressive a body of authority that one must yield to it, if, like me, he thinks them wrong in principle and unfortunate in result. On the other hand, I regard § 20 of the Copyright Act as confirming the view I take. That provides that if "by accident or mistake" the owner of a copyright omits the statutory notice from "a particular copy or copies" the omission shall not "prevent recovery * * * against any person who, after actual notice" infringes "but shall prevent the recovery of damages against an innocent infringer who has been misled by the omission of the notice"; and indeed even the injunction is made conditional upon the owner's reimbursing the infringer for any "reasonable outlay innocently incurred," at the court's discretion. That section does not of course apply to the case at bar; but it shows that when Congress provided for the general subject of an "innocent infringer," not only did it deny liability in the situation before us, but even when the infringement had been by directly copying from the author's own copies: i.e. from the very work itself. Certainly the liability of one who innocently copies from an infringer ought not to be greater than that of one who uses the author's copy. Whether the courts of New York would consider the action of Congress a makeweight in deciding the law of "literary property" of that state, I cannot of course be sure; but it seems to me probable that they would; I can only say that, anticipating any decision of theirs upon the point, I should so assume.

The situation is obviously different as to profits and an injunction. As soon as a publisher learns that his original was a copy, he may of course be enjoined. Prince Albert v. Strange, 2 DeG. & S. 652; affirmed, 1 Macn. & G. 25. As for profits from earlier publication, to allow even an innocent publisher to retain whatever can be traced as the fruit of an author's work, would unjustly enrich him at that author's expense, quite regardless of whether he had invaded the author's monopoly.