GRACE A. FENDLER, Respondent, *v.* OLIVER MOROSCO et al., Appellants.

(Argued January 15, 1930; decided March 18, 1930.)

*Charles H. Tuttle, Carl E. Peterson* and *Alfred Beekman* for appellants. There is no evidence that defendant Tully copied anything from the plaintiff. (13 Corpus Juris, 1217; *Trow Directory Co.* v. *U. S. Directory Co.,* 122 Fed. Rep. 191; *Hotten* v. *Arthur,* 1 Hem. & M. 603.) The few similarities between the new matter in defendant Tully's completed play and the plaintiff's play are no evidence of copying by him. (*Underhill* v. *Belasco,* 254 Fed. Rep. 838; *Stevenson* v. *Harris,* 238 Fed. Rep.

432; *Bobbs-Merrill Co.* v. *Equitable Motion Pictures Corp.*, 232 Fed. Rep. 791; *Bachman* v. *Belasco*, 224 Fed. Rep. 815; *Hubges* v. *Belasco*, 130 Fed. Rep. 388.) The two plays are so unlike in theme, development, plot, impression and moral that there is no recognizable identity and no possibility of actionability. It is the plot, and not mere incident, which determines actionability. (*Curwood* v. *Affiliated Distributors*, 283 Fed. Rep. 223; *Eichel* v. *Marcin*, 241 Fed. Rep. 404; *Vernon* v. *Shubert*, 220 Fed. Rep. 694; *Stodart* v. *Mutual Film Corp.*, 249 Fed. Rep. 507; *Hubges* v. *Belasco*, 130 Fed. Rep. 388; *Stevenson* v. *Harris*, 238 Fed. Rep. 432; *Underhill* v. *Belasco*, 254 Fed. Rep. 838.)

*Walter H. Pollak, William Rand, Melville H. Cane, Carl S. Stern, Robert C. Rand, Harold A. Fendler* and *Paul N. Turner* for respondent. The resemblances were so many and so striking that they could not have occurred by mere coincidence but must have resulted from willful misappropriation. (*Chappell* v. *Fields*, 210 Fed. Rep. 864; *Falk* v. *Donaldson*, 57 Fed. Rep. 32; *Boosey* v. *Empire Musical Co.*, 224 Fed. Rep. 646; *Fisher* v. *Dillingham*, 298 Fed. Rep. 145; *Chicago Record-Herald Co.* v. *Tribune Assn.*, 275 Fed. Rep. 797; *Maurel* v. *Smith*, 220 Fed. Rep. 195; *National Institute, Inc.*, v. *Nutt*, 28 Fed. Rep. [2d] 132; *West Publishing Co.* v. *Thompson*, 169 Fed. Rep. 854; *Daly* v. *Webster*, 56 Fed. Rep. 483; *Dam* v. *Kirk La Shelle Co.*, 175 Fed. Rep. 902; *Italian Book Co.* v. *Rossi*, 27 Fed. Rep. [2d] 1014; *Van Heusen* v. *Earl & Wilson*, 300 Fed. Rep. 922; *Franc-Strohmenger & Cowan* v. *Seigman*, 27 Fed. Rep. [2d] 785; *Kurtz* v. *Belle*, 280 Fed. Rep. 277; *Haas* v. *Feist*, 234 Fed. Rep. 105.) The judgment was amply supported by the findings. (*Belford* v. *Scribner*, 144 U. S. 488; *Callaghan* v. *Myers*, 128 U. S. 617; *Dam* v. *Kirk La Shelle Co.*, 175 Fed. Rep. 902; *Callaghan* v. *Myers*, 128 U. S. 666; *Mawman* v. *Tegg*, 2 Russ. 385.)

LEHMAN, J. In April, 1911, the defendant Tully copyrighted a play called "The Bird of Paradise." It was produced by the defendant Morosco in September, 1911. In February, 1912, the plaintiff, claiming that the play was substantially copied from a play called "In Hawaii" which she had written, began this action to enjoin the defendants from producing the play. As an incident to that relief she asked an accounting. After a motion for a preliminary injunction was denied, the case was marked "reserved generally" upon the calendar of the court, and was not brought to trial till 1924. Then the court granted an injunction and ordered an accounting of the profits of the defendants. Final judgment has now been awarded to the plaintiff for more than $780,000.

At the time when the defendants copyrighted and produced the play "The Bird of Paradise," the play "In Hawaii" had not been published. It was not copyrighted till five years thereafter. It has never been produced or generally distributed. Though the copies introduced in evidence by the plaintiff were concededly typewritten after this suit was begun, the plaintiff produced evidence to show that her play was completed in 1909, and that in March, 1910, she submitted a copy of the manuscript of her play to the defendant Morosco at his office in Los Angeles. Concededly neither defendant had access to the play "In Hawaii" before that time.

The plaintiff has annexed to the complaint a schedule of material which she claims is common to both plays. In both plays the scene is laid in the Hawaiian Islands. In dramatic form both plays present a story in which a young American, who has come to the Hawaiian Islands to work, succumbs to the charms of a native Hawaiian maiden. In both, native customs, religious rites, songs, dances and folklore are introduced as a background for the story and form a significant part of the dramatic composition. A detailed analysis of similarities and differences in the matter which it is claimed in the schedule

is common to both plays, would serve no purpose at this point, for it appears without dispute that much of that matter could not have been taken by the defendant Tully from the plaintiff's play. An elaborate " scenario " for the play " The Bird of Paradise " was written by Tully and submitted by him to the managers of the New Theatre in New York city prior to March 22, 1910. On that day a written contract was made for the production of a completed play to be based on the scenario, with some changes suggested by the managers. Tully then received $500 as advance royalties, and immediately started for Hawaii, by way of California, to obtain additional material for the play. Concededly Tully did not, prior to that time, have access to the play " In Hawaii," and took none of the material of the scenario from that play. In large part the finished play " The Bird of Paradise " as copyrighted and produced in 1911 may be said to be the artistic development and elaboration of literary material contained in the scenario. Some changes have been made in the story, and some new material has been incorporated in the play. Only the new material could have been taken from the play " In Hawaii." The remainder is concededly not the literary property of the plaintiff, though the courts below have held that the literary property of the plaintiff is inextricably interwoven into the whole play " The Bird of Paradise."

Any claim that the defendant Tully derived from the play " In Hawaii " the conception of dramatizing a story of the love of an American youth and a native Hawaiian maiden against a background of Hawaiian customs and manners, was abandoned by the plaintiff when it appeared that this conception was in fact embodied by Tully in literary form in the scenario. Some other claims of similarity in details set forth in the schedule are in fact illusory. Nevertheless, perhaps, there are sufficient points of similarity between the play " In Hawaii " and the play

"The Bird of Paradise" to justify an inference that "the resemblances and similarities between 'In Hawaii' and 'The Bird of Paradise' were so many and so striking that they could not have occurred by mere coincidence, but on the contrary that one of the parties must have had access to and appropriated" some of the conceptions of the other. In fact the trial judge found in his decision that the defendant Tully and his counsel so conceded.

The plaintiff at the trial was compelled to rely on such an inference or concession as a basis for any claim that the defendant appropriated her literary property. The direct evidence produced by her, if believed, shows that she had written her play before "The Bird of Paradise" was completed, and that during the few weeks that Tully was in California after leaving New York and before going to Hawaii to complete the play, "The Bird of Paradise," it was possible that the defendant Morosco might have shown her play to Tully. That he did show the play at that time rests upon conjecture, which is justified only if material common to the two plays, and which is not found in the scenario, presents resemblances so frequent and so striking that they could not have occurred by mere coincidence, but on the contrary that one of the parties "must have had access to and appropriated" some of the conceptions of the other. Throughout the trial the plaintiff made this contention.

The defendant Tully and his counsel also urged at the trial that similarities and resemblances in the two plays were significant. Indeed, the defendant Tully conceded on cross-examination that in his opinion "the internal evidence in those two plays is of such strength as to make it manifest that material from one play must have been used in the other." He was referring, however, to all the similarities and resemblances in the two plays. He did not exclude the material in "The Bird of Paradise" which was also in the scenario and which was concededly not derived from "In Hawaii." Independently, he had

conceived, and embodied in the scenario, many features which appear in both plays. His contention throughout the trial was that every significant similarity and resemblance in the two plays might be found also in the scenario, and that since concededly he had prepared the scenario independently, this " internal evidence " made manifest that the material common to both plays was taken by the plaintiff from the defendant's play " The Bird of Paradise " and demonstrated that the plaintiff's evidence that she had completed her play in 1909 and submitted the manuscript to Morosco in 1910 was false. Neither he nor his counsel ever conceded that in the material introduced into " The Bird of Paradise," after the scenario for the play was completed, any significant resemblances or similarities to the play " In Hawaii " can be found. Certainly neither conceded or was understood to concede that resemblances or similarities so frequent and so striking can be found as to require or justify an inference that they were not the result of coincidence.

The trial judge has found that the plaintiff completed her play in 1909. Then, of course, no material in that play could have been appropriated from the scenario or the play " The Bird of Paradise," completed thereafter. There is some evidence to sustain that finding, and the internal evidence of similarities in the play " In Hawaii " and the scenario of " The Bird of Paradise " does not conclusively show that plaintiff's claim is false. Perhaps error in the exclusion of testimony offered by the defendant to show that plaintiff's claim is a fabrication might require a new trial if that issue were decisive of the case. For the present we accept that finding. The question still remains whether the evidence fairly leads to the conclusion that the defendant Tully wrongfully appropriated any literary property of the plaintiff in completing his play after he had finished the scenario.

Upon that question no concession made by the defendants or their counsel has any material bearing.

In general outline the plots of the plays " In Hawaii " and " The Bird of Paradise " are entirely dissimilar. True, as we have pointed out, the scene of both plays is laid in Hawaii, in both an American falls in love with a native Hawaiian girl, and in both the dramatist has sought to introduce an attractive and novel local color by presenting Hawaiian customs, religious rites, songs and dances; but the conception of a play which should have all these features was formed by Tully independently, for all these features are contained in the scenario as well as in the finished play. There may be literary property in a particular combination of ideas or in the form in which ideas are embodied. There can be none in the ideas. " Ideas, it has always been admitted, even by the Stationers Company, are free as air. If you happen to have any, you fling them into the common stock, and ought to be well content to see your poorer brethren thriving upon them." (" Copyright in Books, " by Augustine Birrell, page 167.) In the form in which these basic ideas are embodied, little, if any, similarity in " The Bird of Paradise " and " In Hawaii " can be found.

In his scenario Tully sets forth certain basic themes which he has sought to present in dramatic form. " The disappearance of the so-called inferior races before the advancement of the Anglo-Saxon race. * * * Degeneracy and death is the penalty that has always been paid by the higher race that seeks to raise the lower by amalgamating with it. * * * The play * * * thoroughly dramatizes the well-known fact that though we dress, educate and polish the members of a lower race to the superficial religious and social equality with the Caucasian, at heart he is still the fetish-worshipping savage who will become atavistic in every moment of stress. * * * The play is only a tragedy in one sense — that is for the girl who represents the weaker

race and the man who mates with her. Hope and salvation are working out for the dissolute beach-comber who climbs from degradation to the highest honor among men through his having kept himself racially pure and his mating with the clear-eyed intelligent girl of his own kind."

The play "The Bird of Paradise" as outlined in the scenario, and as copyrighted and produced in its changed and completed form, presents these basic themes. A young man fresh from college comes to Hawaii to work among the lepers of Molokai. The steamer stops at one of the other Hawaiian Islands. There he meets and falls in love with a beautiful Hawaiian girl who has been brought up as his daughter by an Hawaiian priest. They marry, and instead of proceeding to Molokai, he stays on the island with her and her friends and family. There the young wife is happy, but the young husband loses his ambition and his self-respect. With a light heart she has accepted the religious and moral precepts of an American missionary and has discarded the religious myths of the Hawaiians, yet the discarded myths and the rejected superstitions of her own people exercise a more potent sway over her than the accepted religious and moral precepts of an alien people. Joyous and beautiful as a bird of paradise in the tropical forest, she flutters about like a caged bird when the conventions of Western social life restrain her freedom. For love of her husband she follows him into a world of Western conventions, only to find that there she is an incubus upon her husband. She leaves him to cast herself into a volcano to appease the wrath of the goddess Pele.

Intertwined in this story of the love and marriage of a Caucasian and an Hawaiian is the story of the love of two Americans. Together they go to Molokai to work among the lepers, and the man, who has been a beach-comber and a social outcast, there regains his ambition and self-respect and succeeds in isolating the germ of leprosy.

The story of the play " In Hawaii " shows no traces of similar basic themes. A young American physician has come to Hawaii under an assumed name. There he discovers the germ of leprosy. He was married in America, but in Hawaii he falls in love with an Hawaiian princess, and when she proudly spurns his offer of illicit love he offers to marry her. She is the daughter of a foreign nobleman, but through her mother she is the last descendant of the royal line of Kamehameha. She is wealthy and socially sophisticated, indeed, the leader of the cosmopolitan society of Honolulu. She has renounced the throne though the legitimate sovereign of the islands. At the risk of death she spurns the offer of marriage of the American doctor. Then the doctor's wife opportunely arrives to comfort him, and the Hawaiian princess triumphantly awaits the coming of another foreign nobleman whom she has promised to marry.

In spite of the entire dissimilarity of the two plays in theme and story there are many similarities in detail. Perhaps this is inevitable in two plays about Hawaii. The very name Hawaii seems to suggest to Americans the hula dance and the sport of swimming; flowers and sunshine and music. It suggests too the dread disease of leprosy. All these things are introduced, though with varying emphasis in both plays. Doubtless the value of the producing rights of the plaintiff's play must have suffered by the successful production of any play about Hawaii. Of that she cannot be heard to complain. The defendants' right to produce the play outlined in the scenario was not qualified, though it appears that the plaintiff had completed her play earlier. They might not, however, after the scenario was written, appropriate literary property of the plaintiff and insert it in the finished play based on the scenario.

We have pointed out that when the managers of the New Theatre accepted the play as outlined in the

scenario, they suggested certain changes, and that the play was completed in final form in accordance with these changes after Tully had visited Hawaii. We are concerned only with the new material that then found its way into the defendants' play. In the scenario the last act takes place in New York, where the young American husband had brought his Hawaiian wife. The suggestion was made that the whole play should take place in Hawaii. In the finished play the last scene took place in Honolulu. The circumstances which served to explain the move from one of the smaller islands to New York furnished no explanation of the move to Honolulu. To that extent it was necessary to introduce new elements into the story of the play. In the finished play the character, manners and traditions of the Hawaiian wife remain unchanged, but no longer is she the daughter of the priest who brought her up. She is the last of the legitimate royal line of Kamehameha, though until her eighteenth birthday she was in ignorance of her royal descent. An American trader who leads a revolution in Hawaii to promote his own commercial purposes offers her the throne with the suggestion that she is to be queen in name and form while he runs the government. She refuses, but at her husband's urging moves to Honolulu to give him opportunity to play an important role in the new provisional government. In the play " In Hawaii " the heroine is, as we have pointed out, the last descendant of Kamehameha and has renounced the throne. In that play, too, the reigning sovereign is only a figure-head, with an American prime minister who runs the government. Other new material, too, is indicated by the plaintiff which may have been suggested by a reading of plaintiff's play.

The line of Kamehameha was in fact the legitimate royal line of Hawaii until it died out. There were in fact stories current that a princess of the royal line survived. So, too, there had at one time been an American prime

minister who held most of the important offices in Hawaii and completely dominated its government. The plaintiff, who at one time lived in Hawaii, took historic facts and common stories and embodied them in her play. She acquired no exclusive property in them. Others might use them at their will in different combinations and forms. We are not now considering whether the defendant Tully made a fair use of plaintiff's play. Since plaintiff had not published or produced her play, perhaps any use that others made of it might be unfair. Perhaps a wrong was committed if the defendant Tully even read the play. This action is not brought to redress such wrong. We consider only whether the defendants have appropriated the plaintiff's literary property.

" Patents and copyrights approach, nearer than any other class of cases belonging to forensic discussions, to what may be called the metaphysics of the law, where the distinctions are, or at least may be, very subtile and refined, and, sometimes, almost evanescent. * * * So, in cases of copyright, it 'is often exceedingly obvious, that the whole substance of one work has been copied from another, with slight omissions and formal differences only, which can be treated in no other way than as studied evasions; whereas, in other cases, the identity of the two works in substance, and the question of piracy, often depend upon a nice balance of the comparative use made in one of the materials of the other; the nature, extent and value of the materials thus used; the objects of each work; and the degree to which each writer may be fairly presumed to have resorted to the same common sources of information or to have exercised the same common diligence in the selection and arrangement of the materials." (Per STORY, Circuit Judge, in *Folsom* v. *Marsh*, 2 Story, 100; 9 Fed. Cas. 4901.)

Where decision depends upon a " nice balance " of such factors, then perhaps it may be said that a question of fact is presented. Here, a reading of the record dis-

closes no evidence which could fairly lead to an inference that Tully copied the plaintiff's play and appropriated her literary property. He conceived the basic theme of his play before he had opportunity to read the plaintiff's play. Even after the time when, it is said, he read the plaintiff's play and appropriated from that play details of Hawaiian customs, religious rites, songs and dances, he went to Hawaii for the purpose of acquiring knowledge about such matters. We have examined in detail all the material which the plaintiff claims was derived from her play. In part we find no similarity; in part we find in the scenario itself the same material though in an embryonic state; in part we find explanation of alleged similarity in the circumstance that both plays seek to present the life and customs of the same tropical islands. Material which may have been derived by Tully from the plaintiff's play is either insignificant in itself or, as a result of the craftsmanship of Tully, has been changed in form and is used in entirely different combination.

In determining the effect of the use of such material, we can derive little aid from a restatement of the decisions arrived at by the courts in the reported cases, for each case was decided upon its own facts. All use similar tests, though exact formulation of the test is as difficult as its application when the question is close. (See Weil on American Copyright Law, § 1030.) Augustine Birrell, a literary craftsman as well as a distinguished practitioner and teacher, has said: " The literary larcenist must do more than filch ideas, imitate mannerisms, repeat information, borrow phrases, utilize quotations; you must be able to attribute to him the felonious intention of appropriating without independent labour a material part of a protected work." (" Copyright in Books," p. 169.)

A part, however small, of a work which is appropriated is material where the result of the appropriation is the suggestion or impression of similarity or identity. (See *West* v. *Francis*, 5 B. & Ald. 737; *Hanfstaengl* v. *Baines*

& Co., Ltd., [1895] A. C. 20; *Boosey* v. *Empire Music Co., Inc.,* 224 Fed. Rep. 646; *Chicago Record-Herald Co.* v. *Tribune Association,* 275 Fed. Rep. 797.) Here, aside from the fact that both plays are Hawaiian in atmosphere and detail, there is no suggestion of similarity or identity in the finished plays; certainly no suggestion more potent than in the scenario. Changes made in the play after the scenario was completed may add new dramatic effect, but even though the effect may be the result of material derived from "In Hawaii," that material is used with different purpose and with different effect in "The Bird of Paradise."

We cannot attempt, in this opinion, to answer every contention of the plaintiff. We point out only that the changes, considered separately and in combination, do not affect the general impression made by the story told. Essentially every character introduced in the play is the same person conceived in the scenario and bears little if any resemblance to the characters of "In Hawaii." The American trader, who, in "The Bird of Paradise," suggests for his own selfish purposes that the Hawaiian princess should become a queen, so that he might hold the real power in the new government, bears no resemblance to the historic character, introduced into "In Hawaii," of the American prime minister who is a loyal servant of the Hawaiian people though the master of its puppet king. Though both young men have come to Hawaii to study the disease of leprosy, the American physician, who in the play "In Hawaii," seeks with evil purpose the love of an Hawaiian princess and then regains the fine ideals of his early manhood, bears no resemblance to the young American in "The Bird of Paradise" who has come to Hawaii with high ideals and through his marriage with an Hawaiian girl, though she be a princess, loses his ideals. The wealthy, sophisticated Hawaiian princess of "In Hawaii," the idol of Honolulu society, the proud daughter of a foreign noble-

man, the fit bride of another nobleman, bears no resemblance to the half-primitive Hawaiian girl, brought up by a priest as his daughter, the unfit bride of a degraded American, scorned by the society of Honolulu, though both are legitimate queens who have renounced the throne of Hawaii. Indeed, here similarities in situation emphasize essential differences. The insulting offer of an illicit love in " In Hawaii " is spurned because royal blood and social position make her superior to other Hawaiian natives, even superior to the white man who then offers her marriage. In " The Bird of Paradise " even royal birth brings only greater poignancy to the social stigma of a colored skin, so that at the end the " princess " exclaims: " I *am* an Hawaiian princess and yet never will I be white. It is tabu — tabu to be my son and my son's son; and after that, tabu."

We have assumed that even these similarities in details are the result of suggestions derived from the play " In Hawaii," though argument to the contrary might be made. Even if a surreptitious reading of the play " In Hawaii " may have resulted in the introduction of some new material into " The Bird of Paradise," where resemblance is close the material is trivial in character and where the material is more important in the development of the story, then, at most, plaintiff's ideas have been appropriated but used in different form and combination. No material part of plaintiff's literary property has been appropriated. Neither in substance nor in embellishment is there any resemblance between the two plays. Details must be viewed in their setting; then resemblances vanish.

The judgment should be reversed and the complaint dismissed, with costs in all courts.

CARDOZO, Ch. J., POUND, CRANE, KELLOGG, O'BRIEN and HUBBS, JJ., concur.

Judgment reversed, etc.