Birdie Amsterdam, J.
The plaintiff, in this suit, seeks an injunction and damages, predicated on his claim that his unpublished play entitled “ The Battle Goes On ” was plagiarized by the defendants’ motion picture entitled “ With These Hands ”.
Originally his complaint charged, in two separate causes of action, that the defendants ’ motion picture infringed (1) a copyrighted English version of his play, and (2) an uncopyrighted Yiddish version. Because the first cause of action was based on copyright, the entire case was removed to the Federal court. There, as the trial was about to commence, the plaintiff withdrew his first cause and the case was remanded to this court.
Succinctly stated, the remaining cause relating to the uncopyrighted Yiddish version alleges that defendants had read plaintiff’s manuscript and incorporated the situations, characters, dialogue, props and “substantially the whole framework” of the play into their movie.
The play “ The Battle Goes On ” was written by plaintiff in the Yiddish language in 1936 and was performed in that language on March 7, 8 and 9, 1947, at the Grand Street Playhouse, 466 Grand Street, New York City. It is a melodrama about a fictional strike in the textile industry and the life of the family of the worker, one Harry Silverstein, who leads the strike. His son is a hoodlum who opposes him and leads strikebreakers in an effort to break the strike. Harry’s daughter, on the other hand, is in sympathy with the strikers. She loves and is loved by the boss’ son. The latter also is in concert with the strikers. Near the close of the play, Harry is fatally shot battling the strikebreakers who are led by his ruffian son. Before he dies, he exhorts his fellow workers to carry on the fight. When performed, this was the end of the play.
Plaintiff claims that prior to March 7, 1947 he made some revisions in his manuscript and in early April, 1947 wrote an appendage of a series of narrated flashbacks of historic events that occurred after the strike. These included the first World War, the 1929 stock market crash, the great depression, the election of Roosevelt, the National Recovery Act, the Wagner Act, the second World War, the soldiers returning from the war, and the Taft-Hartley Act.
On March 19, 1947 plaintiff copyrighted an English version of his play. Admittedly, none of the critical revisions and additions alleged to have been made in the Yiddish version, appear in the copyrighted English version.
It is further claimed by plaintiff that on June 5,1947 he mailed his revised Yiddish manuscript to the defendant union, for possible production, and that a few weeks thereafter the defend *462 ant Mark Starr, director of the union’s educational department, notified him that the union was not interested and returned the manuscript. Plaintiff subsequently learned that the defendants produced and distributed a motion picture entitled ‘1 "With These Hands ’ ’ and advertised as written by the defendant Morton Wishengrad.
It is argued by plaintiff that the time span covered by the motion picture, the historical events of that era, and such occurrences as strikers, picketing, employer anti-union sentiment, and the fear of wives that striking husbands will not be able to pay their bills, were tortiously appropriated from his play.
The charges and accusations are categorically denied by the defendants. They contend that the plaintiff altered his manuscript and incorporated the claimed changes, revisions and appendage after the exhibition of defendants’ motion picture — that whatever copying was done, was done by the plaintiff from the movie, not the other way around.
The defendant Starr testified that he never received, saw or read the plaintiff’s alleged manuscript or play. He asserts, that it was not the alleged manuscript, but merely a short English synopsis that plaintiff sent the union. The synopsis was limited to events in the early 1900s and was returned to plaintiff with a covering letter of criticism because it was limited. (That a synopsis was sent to defendant union is denied by plaintiff.)
The defendant Morton Wishengrad, a well-known dramatist and script writer, testified that in 1949 he was requested, on the defendant union’s behalf, to write a scenario in commemoration of its fiftieth anniversary and thereupon wrote the script of the film “ With These Hands”. He further testified that it was based on his own personal experience as an ILGWU employee, his knowledge of the defendant union’s history and achievements, and his independent research in historical material dealing with the defendant union. He asserts that he never saw, read or heard of the plaintiff’s alleged manuscript or play, until after the motion picture was exhibited.
The film was produced by the defendants, Promotional Films, Inc., Classic Pictures, Inc., and the ILGWU, and released and exhibited in May of 1950. It tells of the history of the defendant union as seen through the eyes and participation of a rank and file garment worker, one Alexander Brody, between 1910, when he engaged in the cloakmakers’ strike, and the late 1940s, when he applies for retirement benefits. Basically, it is a documentary film, portraying actual events in the ILGWU’s history and its achievements. None of the following incidents — around which *463 the film is oriented — is portrayed in plaintiff’s play: The cloak-makers ’ strike of 1910, the Triangle Waist Co. fire of 1911, the attempt of the Communist party to control the union in the 1920s, the general strike in the ladies’ garment industry in the 1930s, the union’s organizing campaigns of the 1930s, the union health center and its services, its health and welfare benefits, vacations with pay, its Unity House, a non-profit resort, its retirement funds. This portrayal (as it proceeds) is related historically to such events as the first World War, the 1929 crash, the depression of the 1930s, Roosevelt’s election, and section 7A of the National Recovery Act.
Each of the following elements is — -in context, manner of use, object of use, and totality of impact — strikingly different: Defendants’ strike is the cloakmakers’ industry-wide strike in 1910 (a real event). Plaintiff’s strike is in a local textile plant sometime in the 1900s. Defendants’ hero is simply a loyal union rank and file member. Plaintiff’s hero is the leader and moving force of the plant’s union organization. The workers’ families are different and play different roles. The wife in defendants’ film is a strong-willed woman. In plaintiff’s play, the wife is a weak, complaining person. In defendants’ film there is one child, a 10-year-old girl, who plays a minor role. In plaintiff’s play, the children are vital in its development — the son Mike is an antiunion thug who evolves into a union leader — the daughter Sarah loves and is loved by the employer’s son. No comparable characters appear in defendants’ movie. The Italian worker in defendants’ film is one of the 2 central worker characters and one of the 3 stars around whom the movie centers. In plaintiff’s play, there is an Italian worker who has merely a walk-on role with a few lines.
In reality, the movie differs strikingly from plaintiff’s play. There are a few similar lines of dialogue ■ — at most, 7 or 8 lines are involved. They constitute a trivial and insignificant part of the respective works.
The plaintiff urges that the defendants pirated the “ idea ” of pickets (just 2 in number); the “ theory ” of a boss arguing with workers; the “ theory ” behind his reference to Eugene V. Debs (which in the movie is a ballot-counting scene involving Morris Hillquit, a Socialist candidate and once ILGWU general counsel); the “theory” of associating Franklin D. Roosevelt with the progress of trade unionism.
To establish his cause of action, the onus is on the plaintiff to prove his priority of the literary material in issue; access by defendants thereto; and intentional copying of the whole *464 or a substantial part thereof without authorization (Tamas v. 20th Century-Fox Film Corp., 25 N. Y. S. 2d 899; Smith v. Berlin, 207 Misc. 862).
Based on the credible evidence, there is no satisfactory showing by plaintiff, of any of these elements essential to his case.
The first question to be resolved is whether the allegedly pirated material is original. In the case of Becher v. Loew’s, Inc. (133 F. 2d 889, 891), the court aptly stated: “ ‘ The object of copyright is to promote science and the useful arts. If an author, by originating a new arrangement and form of expression of certain ideas or conceptions, could withdraw these ideas or conceptions from the stock of materials to be used by other authors, each copyright would narrow the field of thought open for development and exploitation, and science, poetry, narrative, and dramatic fiction and other branches of literature would be hindered by copyright, instead of being promoted. A poem consists of words, expressing conceptions of words or lines of thoughts; but copyright in the poem gives no monopoly in the separate words, or in the ideas, conception, or facts expressed or described by the words. A copyright extends only to the arrangement of the words. A copyright does not give a monopoly in any incident in a play. Other authors have a right to exploit the facts, experiences, field of thought, and general ideas, provided they do not substantially copy a concrete form, in which the circumstances and ideas have been developed, arranged, and put into shape. ’ ’ ’
Plots and incidents taken out of the public domain are not susceptible of copyright and are not protectable (Fendler v. Morosco, 253 N. Y. 281; Hewitt v. Coward, 180 Misc. 1065, affd. 266 App. Div. 992; Nichols v. Universal Pictures Corp., 45 F. 2d 119 [C. C. A. 2d.], cert, denied 282 U. S. 902; Dymow v. Bolton, 11 F. 2d 690).
To illustrate', it is ridiculous to state that the 1932 election of Franklin D. Roosevelt is subject to copyright, merely by incorporating that event into a play (cf. Lake v. Columbia Broadcasting System, 140 F. Supp. 707).
A reading of plaintiff’s play and a viewing of defendants’ motion picture disclose no evidence which could fairly lead to a finding or inference that defendants copied plaintiff’s play or a material part thereof. Some slight similarities that exist necessarily stem from the subject matter and some belong to the public domain.
ILGrWU is a union comprised of several hundred thousand people who work in the garment trade. It is common knowledge *465 that their lives have rotated around tenement and factory. In the factories, they operate sewing machines. The story of these people and their union necessarily involves strike activity and other typical events commonly associated with the history of American trade unionism. Their story also necessarily involves political events such as the depression and the New Deal.
The source of the motion picture is well-documented history, recorded in the experience of the union’s members and memorialized in books written long before the plaintiff’s play was written. From the credible evidence it appears that Wishengrad learned the story of “With These Hands”, met the kind of people portrayed therein and knew the allegedly similar incidents long before the date that the plaintiff claims the defendants had access to his play. A finding that the motion picture was the independent work of its author Wishengrad is amply warranted.
Assuming the existence of access and of copying, and, further, that the copied material is not in the public domain, plaintiff still has to demonstrate the materiality of the appropriated parts. The copying must be of a substantial part of plaintiff’s work. (Fendler v. Morosco, 253 N. Y. 281, supra; Navara v. Witmark & Sons, 17 Misc 2d 174.) Trivial similarities, even if appropriated, are of no legal import and are not protectable. The language of the court in Fendler v. Morosco (supra), at page 292 is particularly appropriate in this connection:
“ ‘ The literary larcenist must do more than filch ideas, imitate mannerisms, repeat information, borrow phrases, utilize quotations; you must be able to attribute to him the felonious intention of appropriating without independent labour a material part of a protected work. ’ ’ ’ (Emphasis supplied.)
While differences may not be used to cloak a substantial lifting of a novel or concrete arrangement of an idea, yet it cannot be said that the idea or its concrete form has been substantially lifted where the differences are not only material and significant but actually constitute a different work.
In the case at bar, plaintiff’s claims involve, at best, some similar material which belongs to the public domain and some details which in the total context are trivial.
The basic criteria for judging the materiality of allegedly appropriated material are the totality of the impact of one work as -compared to the other ; the manner in which the materials were used and the objects of each work {Folsom v. Marsh, Fed. Cas. No. 4,901; 2 Story 100). The similarity must be one that would be apparent upon ordinary observation. It *466 is the impression, the ordinary viewer receives by which their similarity must he judged (Dymow v. Bolton, 11 F. 2d 690, supra). It is not to be determined “by the fine analysis or by argument and dissection of an expert, but by ordinary observation” (Wiren v. Shubert Theatre Corp., 5 F. Supp. 358, 362, affd. 70 F. 2d 1023, cert, denied 293 U. S. 591).
Applying the test of ordinary observation to a comparative reading of the two subject works invokes no consciousness or impression of plagiarism. They are entirely dissimilar. The context, the manner of treatment, the object of use of various incidents and the totality of the impact are strikingly different. They differ in theme, plot and purpose. The characters and motivation's are different; the sequence of events is different; the emotions and thoughts that each work conveys are different; whatever resemblance appears is either trivial or the result of a labored analysis. The ordinary observer would not find that a substantial and material portion of plaintiff’s play had been copied in defendants’ motion picture, and would consider the alleged copied material as trivial in relation to the whole of the respective works.
As heretofore stated, it is fundamental that in order to establish piracy, in addition to proving that defendant, without authorization, consciously and intentionally copied the whole or a substantial part of plaintiff’s literary property (Columbia Pictures Corp. v. Krasna, 65 N. Y. S. 2d 67, affd. 271 App. Div. 1008), plaintiff must demonstrate that the defendants had access thereto (McKay v. Barbour, 199 Misc. 893, 895; Lewys v. O’Neill, 49 F. 2d 603; Sarkadi v. Wiman, 43 F. Supp. 778). Accidental similarity is not actionable plagiarism (Tamas v. 20th Century-Fox Film Corp., 25 N. Y. S. 2d 899, supra). Copying may be shown by direct evidence of access, that the alleged plagiarist had seen or heard the plaintiff’s work, or by proper circumstantial evidence (Heywood v. Jericho Co., 193 Misc. 905). Hypothetically, the circumstantial evidence may be such an overwhelming similarity between the works in issue as to preclude the possibility that plaintiff and defendant independently arrived at the same result (Columbia Pictures Corp. v. Krasna, supra). The usual circumstantial evidence of copying is a combination of direct evidence of access and sufficient similarity to allow an inference of copying (Arnstein v. Porter, 154 F. 2d 464). Mere circumstantial evidence, without more, cannot as such lead to a further inference of copying (People v. Razezicz, 206 N. Y. 249), otherwise, a “ fatally vicious ” process of deduction dependent upon surmise is unleashed (People v. Kennedy, 32 N. Y. 141, 146).
*467 Plaintiff has stipulated that his only claim of access by defendants is through an alleged mailing of plaintiff’s manuscript to defendant union on June 5, 1947. The credible evidence however belies his claim and justifies the finding that defendants did not have access. This conclusion is supported by the following:
In his sworn pretrial answers to written interrogatories, plaintiff listed one Bhoda Silkowitz as the only witness to his June 5, 1947, mailing. Yet this person was not produced or her absence otherwise explained at the trial. During his pretrial examination, he testified that he had made handwritten additions on his manuscript after he had seen a stenographer’s version of defendants’ movie, which was subsequent to the Summer of 1950. However, on trial, he claimed that the handwritten additions were inserted prior to March 7, 1947. Yet, on March 19, 1947, he copyrighted an English version of his play in which the critical handwritten additions to the Yiddish version are not present. Significant differences appear in pages 11 and 43 of Exhibits 3, B and C, as compared to the preceding and subsequent pages in each of these exhibits. Page 11 of these exhibits is a critical page in which appears the allegedly plagiarized dialogue between Harry’s wife and Harry, which concludes with her exclamation: ‘ ‘ You can’t strike. You can’t!” Page 43 of these exhibits is also a critical page, in which appears the allegedly plagiarized dialogue: “We don’t want any charity. We want you to recognize the Union.” The spacing between the character name and the dialogue is wider on the pages preceding and succeeding pages 11 and 43 in all three exhibits. There is also a difference between the quality of the paper used on pages 11 and 43 and that of the preceding and succeeding pages in the three exhibits. Plaintiff admits that he sent out numerous copies of a short English synopsis of his play to many organizations and individuals. It is of more than passing import that in these instances he sent a covering letter introducing himself and making clear what it was he wanted. However, when he allegedly mailed the manuscript of his play to defendant union, he included no covering letter. Moreover, when he later allegedly received the manuscript hack from Starr, he asserts that Starr sent no covering letter. Nevertheless, a short time later Starr did send a covering letter with the return of plaintiff’s synopsis. This letter criticized plaintiff’s play (to the extent the play’s nature was indicated in the synopsis) because the play was limited to events in the early 1900s. This letter written by Starr was received by plaintiff but a short time after Starr allegedly *468 rejected the manuscript. Plaintiff also admits he did not reply to Starr’s letter to point out that his manuscript was not limited to the early 1900s (as Starr should have known, assuming plaintiff’s version to be true). It is also noteworthy that plaintiff’s play refers to the passage of the Taft-Hartley Act, but that act had not yet been enacted when the manuscript was allegedly mailed to the union.
The foregoing are just a few of the many specific situations in which the plaintiff’s testimony proved to be unreliable and untrue. It would serve no useful purpose to enumerate in detail the many inconsistencies, contradictions and variances in plaintiff’s testimony.
In judging the credibility of the allegations of copying, the factual situation requires an examination of all the circumstances surrounding the genesis of both works. In this connection, the respective backgrounds of the parties are relevant. The reason for such consideration is the familiar principle that “ Men must be judged as reasonable beings in appraising their conduct ” (Harold Lloyd Corp. v. Witwer, 65 F. 2d 1, 18). In Fred Fisher, Inc. v. Dillingham (298 F. 145 [S. D. N. Y.]), which involved allegations of pirating of a song, by the composer Jerome Kern, Judge Learned Hand commented: “Mr. Kern swears that he was quite unconscious of any plagiarism, and on the whole I am disposed to give him the benefit of the doubt. * * * It is of course possible that Kern might have lifted it bodily, hoping to escape detection. However, he has an established place among composers of light opera, and has already succeeded more than once. Certainly detection would be a matter of some moment to him. No producer willingly invites the suits which follow musical piracy. Once convicted in such a case, Kern’s market might suffer. With the profit small and price high, it seems to me unlikely that he should have set about deliberate plagiarism. ’ ’
In the instant case, Wishengrad is a nationally-known and experienced dramatist. He is the author of numerous outstanding radio, television, and film scripts. He was also a teacher of writing at several universities. It seems hardly likely that an author of his standing, with his own personal knowledge of the union, his familiarity with the union personnel, and the struggles portrayed in the film, and with the abundance of historical material available, would risk his reputation to plagiarize a few commonplace incidents and phrases from plaintiff’s play.
After reading the play, viewing the motion picture, examining the alleged similarities, appraising and evaluating all the *469 evidence, and in the light of all of the surrounding circumstances, I am satisfied that there is no warrant for this litigation. I find and conclude from the credible evidence and the inferences logically flowing therefrom, that the critical changes and appendage in plaintiff’s manuscript were not written in 1947, but after the Summer of 1950. I also find and conclude that there is no satisfactory showing of access to plaintiff’s manuscript by defendants. I further find and conclude that there has been no appropriation by defendants of plaintiff’s property, and that the few similarities that exist are both trivial and insignificant or in the public domain.
Consequently, judgment is awarded in favor of the defendants, dismissing the complaint on the merits. The Clerk of this court is hereby directed to enter judgment accordingly. All motions on which decision was reserved are resolved in conformity with this determination. This constitutes the decision of the court, in accordance with the provisions of section 440 of the Civil Practice Act.