Carol Crosswell **SMITH**, Plaintiff,

v.

**LITTLE, BROWN & COMPANY** and
Edith Patterson Meyer, Defendants.

United States District Court
S. D. New York.
June 25, 1965.

---

Marvin L. Schwartz, New York City, for plaintiff.

Weil, Gotshal & Manges, New York City, for defendant Little, Brown & Co.; Horace S. Manges, Jacob F. Raskin, New York City, of counsel.

McLEAN, District Judge.

This is an action for alleged plagiarism of plaintiff's uncopyrighted, unpublished manuscript. Plaintiff seeks an injunction, an accounting of profits and punitive damages.

The action was begun in the Supreme Court, New York County, and was removed by defendant to this court. Edith Patterson Meyer, named a defendant, was not served. The action went to trial against Little, Brown & Company as the sole defendant.

Jurisdiction is based upon diversity of citizenship.

I find the facts to be as follows:

Plaintiff is a lawyer who has done some legal writing. In earlier years she also wrote a newspaper column and plays for radio. In 1956 she and her husband, a New York investment banker, went to Ireland on a vacation. They visited Ballynahinch Castle, in Connemara, on the west coast of Connaught. The owner of the castle told them about Grania O'Malley who had lived there for a time in the 16th century. Grania was a colorful personality of considerable renown in Irish legend. Comparatively few actual facts about her are recorded in history, but it is known that she was at least the de facto, and perhaps the duly elected, chief of the warlike clan of the O'Malleys, the only member of her sex ever to hold such an office. In that capacity she led the O'Malleys in battle against the invading English and directed them in their piratical forays by sea out of their stronghold on Clare Island in Clew Bay. Historical documents prove that toward the end of her life Grania had an interview with Queen Elizabeth who seems to have been moved not only to forgive Grania her past transgressions, but also to bestow an earldom upon her son.

Plaintiff became much interested in Grania and during her stay in Ireland she read up on her. There have been a number of articles about Grania in Irish journals and at least four historical romances which feature her as the central figure have been published in Ireland or England. Up until the events involved in this case, however, no book about her had been published in the United States.

Plaintiff decided to write such a book. Between the summer of 1956 and the spring of 1957, she wrote a nine-page summary of a proposed novel to be entitled "Pirate Queen of Connaught." In addition, she wrote a six-page outline of the plot of the novel and the first four complete chapters of the work. In March 1957, a friend introduced plaintiff to Williams, then the manager of the New York office of Little, Brown & Company, a publishing firm whose main office is in Boston. Plaintiff submitted her manuscript to him on April 18, 1957.

After reading it, Williams took it to defendant's Boston office sometime during the week preceding May 10, 1957, apparently on May 3.[1] Meanwhile, plaintiff completed a fifth chapter and sent it to Williams. He forwarded it to Bradford, editor in chief of defendant's trade de-

---

1. There is a note on a Little, Brown memo which reads:
   "Received 4/18/57
   Boston 5/3/57"

partment in defendant's Boston office, with a memorandum dated May 10, 1957, referring to it as "another chapter from Mrs. Smith" to be "put with the other four which I left with you last week."

The manuscript, apparently minus Chapter 5, was read by a reader named Buckman in defendant's Boston office who, by memorandum dated May 9, 1957, recommended its rejection. The manuscript was also read, this time probably including the fifth chapter, by Cushman, the managing editor of the Boston office who, by memorandum dated May 14, 1957, expressed the opinion that the idea was good but that the writing was dull. He suggested that Miss Denniston, a professional ghost writer, could probably improve it. Thereafter Williams inquired of plaintiff whether he might submit the manuscript to Miss Denniston. Plaintiff consented. On May 17, Williams wrote to plaintiff stating that he had sent the manuscript to Miss Denniston on that day. It would appear, therefore, that the Boston office must have returned the manuscript to Williams in New York sometime between May 14, the date of Cushman's memo, and May 17, the date of Williams' letter.

Defendant's minutes of the "editorial meeting" held in Boston on May 20, 1957, contain the following entry:

"Carol McCormick Crosswell:[2] 'Pirate Queen of Connaught.' Manuscript to be shown to Elinore Denniston to see if she is interested in putting it into publishable form."

Miss Denniston was not interested in revising the work. Accordingly, on May 29, 1957, Williams wrote to plaintiff returning her manuscript with a polite expression of regret that Little, Brown would not accept it for publication. Williams testified that he made no copy of the manuscript before returning it.

Helen L. Jones is the Editor of the Juvenile Department at defendant's Boston office. She was an acquaintance of Edith Patterson Meyer whom she had known casually since 1946. Mrs. Meyer had a long career in the publishing business, first with Rand McNally for twenty years and thereafter for over ten years as the children's book editor of Abingdon Press.

In June 1955 Mrs. Meyer retired from publishing to devote herself to writing. Her first step was to go to Europe on a vacation. She visited Connemara and there a guide told her about Grania O'Malley. The tale intrigued her, just as it did plaintiff on her trip in 1956.

Upon Mrs. Meyer's return to the United States in 1956, a friend told her that Helen Jones had expressed the hope that Mrs. Meyer would write a book for Little, Brown. Mrs. Meyer met with Miss Jones at the Grosvenor Hotel in New York on September 13, 1956. Mrs. Meyer told Miss Jones what she had learned of the legend of Grania O'Malley. Miss Jones urged Mrs. Meyer to write a book about it for juvenile readers. Mrs. Meyer was interested but made no commitment at that time.

She did nothing about it between September 1956 and May 1957, although during that period she and Miss Jones again from time to time discussed the possibility of such a book.

On May 29, 1957, Miss Jones in defendant's Boston office addressed a memorandum to Williams in defendant's New York office in which she stated:

"Subject *Pirate Queen of Connaught*

I note by the Editorial Meeting Minutes of May 20 that you have a manuscript on this subject which is apparently at present not in publishable form. I thought you might like to know that I had some discussion about a possible children's book concerning the 'Queen' to be written by Edith Patterson Meyer.

\*　　\*　　\*　　\*　　\*　　\*

My thoughts about her in connection with the 'Pirate Queen' are two at present: (1) she might be interested in ghosting the unpublishable

---

2. Plaintiff's maiden name which she used as a pen name.

manuscript you have now, or (2) you might decide that the 'Queen' is a better juvenile project than adult, and it might be well to wait a couple of years for Mrs. Meyer's version. We will require at least a couple if she does it, for she wants to go back to Ireland first.

I've mentioned this to Ned Bradford and he suggested that I tell you my story as above."

This memorandum did not reach Williams in New York until after he had returned plaintiff's manuscript to her on May 29, 1957. He did nothing about authorizing Miss Jones to talk to Mrs. Meyer about ghosting the Pirate Queen.

Mrs. Meyer was then engaged in writing a book for Little, Brown about Alfred Nobel entitled "Dynamite and Peace" which she delivered to Little, Brown in December 1957. On June 30 and July 1, 1957, Miss Jones spent two days with Mrs. Meyer at Mrs. Meyer's home in Stamford, Conn. They testified that they worked together on the manuscript of "Dynamite and Peace." Neither could recall whether they also discussed Grania O'Malley.

By the summer of 1959, Mrs. Meyer had decided that she would write a book about Grania O'Malley for Miss Jones. Mrs. Meyer went to Ireland in 1959 for the purpose of doing research. She visited Connemara, talked to local residents, and read books of Irish history and legend in Irish libraries, and historical documents in the British Museum. She eventually submitted an outline of her work to Miss Jones at Little, Brown on October 30, 1959. The outline was entitled "Pirate Queen—The Story of Grania O'Malley."

In April 1960, Mrs. Meyer's outline was accepted and Little, Brown entered into a contract with her for the book. Thereafter Miss Jones met with Mrs. Meyer on three or four occasions to go over her manuscript with her. Mrs.

Meyer's final manuscript was received by Little, Brown on July 26, 1960. Her book was published by Little, Brown in 1961. It is entitled "Pirate Queen."

There are certain similarities between "Pirate Queen" and the manuscript entitled "Pirate Queen of Connaught" submitted by plaintiff to Little, Brown and rejected by it some four·years earlier. These similarities exist with respect to incidents which concededly have no foundation either in historical fact or in any previously published fiction. Plaintiff claims that these resemblances prove that Mrs. Meyer copied her manuscript. Defendant contends, on the other hand, that any resemblance is purely coincidental. Mrs. Meyer testified that she had never seen plaintiff's manuscript or any copy or summary of it, and that she independently invented these incidents. She testified that Miss Jones did not suggest to her the title or the characters or the plot of her book. Miss Jones testified that she also had never seen plaintiff's manuscript and that she did not show it or any copy or summary of it to Mrs. Meyer. Miss Jones did not recall whether she had even informed Mrs. Meyer of the fact that plaintiff's manuscript existed. Mrs. Meyer testified, however, that Miss Jones had mentioned that fact, but that her reference to it was merely a casual remark made sometime after October 30, 1959.

The extent to which a parallel exists between the two works can best be revealed by a brief summary of them. In considering this subject, it is well to bear in mind that plaintiff's manuscript, apart from the outline and summary, consisted of only five complete chapters. ·

Chapter 1 of plaintiff's manuscript begins the story of Grania O'Malley on her birthday, when Grania becomes of age.[3] Grania has just come home after a period of "fosterage" at the O'Flahertys. She awakens at her father's castle on Clare Island to find that her father, Owen O'Malley, chief of the clan, has not yet returned from last night's raid. She is

---

3. Plaintiff's manuscript is confused as to whether Grania was 18 or 19. Both figures appear. It seems probable that the author intended that Grania became of age at 18.

concerned for his safety. At this point, the faithful O'Malley serving maid, "gnarled old Annie," enters and upbraids Grania for standing around without proper clothing. Grania recognizes the justness of the rebuke. "Yes, Annie," she says, "T'is true, I'm a woman grown."

Grania dresses, mounts her horse "Maeve," named for "the bold Irish queen" and rides off with her younger brother, Sean. As they ride, they discuss the bad times that have afflicted Connaught ever since Elizabeth became queen. Grania rides to the cliff on the coast to watch for her father's return. She rejoices to see Owen's three galleys coming in from the sea. Sean, however, is nowhere to be seen. In some alarm, she rides off to look for him.

Chapter 2 opens with Owen O'Malley just returned, berating Annie for having permitted Grania and Sean to ride off alone. But his fears are put to rest when both return, exhausted but unharmed. Sean, it seems, had been waylaid by an angry stag, but Grania arrived in the nick of time and slew the beast with "one twang of the arrow."

Almost immediately, the chief's guests gather for a feast in honor of Grania's birthday. There is plenty of beef and pig and plenty of ale. Owen drinks a toast to his daughter. She drinks a toast to the clan. The pipers play, the clansmen dance, the bards chant.

The festivities are suddenly interrupted by an English raid. A fierce fight ensues, and although the raiders are beaten off, they succeed in kidnapping Sean. Owen and Grania swear that they will rescue him.

Chapter 1 of Mrs. Meyer's book opens on Grania's eighteenth birthday. Grania is a little worried that her father, Owen, has not returned from sea for this special day. He had promised her a feast with music and dancing to celebrate her birthday. Grania goes up the little mountain on Clare Island to watch for him. On the way, she stops at a shepherd's hut for a chat with the shepherd. They discuss the cruel English and Grania reflects upon

Queen Elizabeth and wonders if the Queen knows what is going on in Ireland.

As Grania climbs, she remembers that it has been several days since she has ridden her horse "Maeve." She resolves to ride her tomorrow. She scans the horizon but sees no sign of her father's galleys. Disappointed, she comes down off the mountains and encounters Father Terence walking in the abbey garden. He reproves her for her disheveled appearance. "Eighteen today, a woman grown, yet looking like a harum-scarum tomboy." Grania is abashed.

She returns to the castle and seeks out Nessa, the elderly serving maid who has been her nurse since birth. Nessa tells her to hurry up and "attire yourself properly." Grania replies with dignity, "Since, as you say, it is now a woman grown I am, no need I see of reporting my doings to you." Nevertheless, Grania follows instructions and attires herself.

Grania then visits old Erlis, who has occult powers, to inquire whether her father's life is in danger. Erlis appears to possess information on the subject, but she will not reveal it. Grania leaves Erlis and visits her friend Eva and Eva's brother Tomas, a handsome captain of the O'Malley's private army. Other young people gather and they join in an impromptu dance until Grania receives word that her father's galley is nearing the harbor.

Chapter 2 opens with a meeting between Grania and her father. He has brought with him a Spanish youth, Don Felipe. Almost immediately they all go to the birthday feast. There is an abundance of food and wine. After dinner a bard chants. Then the pipes begin to play and the whole company dances. Owen drinks a toast to Grania.

Next day, Grania and Don Felipe row over to the mainland and go hunting together. Grania shoots a deer so expertly that Don Felipe compliments her on her marksmanship. After a visit to a monastery, they return to Clare Island.

So much for the similarities and differences in the first two chapters of the

respective works. I now turn again to plaintiff's manuscript to summarize briefly its remaining three chapters.

Chapter 3 is devoted to the fair at Galway which the O'Malleys attend. There Grania encounters Donnell O'Flaherty, the handsome son of the chief of the O'Flaherty clan. He is a prospective suitor of Grania's. He fights with Con O'Rourke, another admirer, and breaks his neck. Although Grania is temporarily shocked by this homicide, she rapidly recovers and enjoys the remaining festivities, including a horse race with Donnell.

In Chapter 4, the O'Malleys set out in their galleys to return to Clare Island. During the voyage they are attacked by English ships. The inevitable fight ensues in the course of which Owen is killed. Grania takes command. In the end, the O'Malleys prevail. Sadly they sail back to Clare Island bearing the body of their dead chief. Teigue O'Malley, Grania's cousin, tells her that she should succeed her father as chief and that he will support her candidacy. He also declares his love for her but promises that he will not seek to interfere with the claims of Donnell O'Flaherty.

Shortly after their return to the island, the O'Malley clan gathers to select a new chief. Hugh Oge O'Malley is a leading aspirant. But first it is necessary to bury Owen. The concluding pages of the chapter are devoted to his funeral.

Chapter 5, the last of plaintiff's completed chapters, deals with the election of the chief. Teigue and Hugh Oge fight. Teigue overpowers Hugh Oge and has him at his mercy. Hugh Oge, in fear of immediate death, agrees to accept Grania as chief. No one else dares dispute her claim. Forthwith, the clan gathers around the ancient crowning stone. The brehon (judge) of the clan hands Grania, who is clad in a flowing white robe, the white staff of sovereignty. He proclaims her chief.

That night Hugh Oge, seeking revenge, attempts to burn the castle but Teigue intercepts him and kills him.

Next morning Grania meets the assembled clansmen and tells them that she has decided to marry Donnell O'Flaherty to unite the two clans.[4] The O'Malleys, however, do not take kindly to this idea unless Grania will agree that she will spend at least half her time at Clare Island. Grania agrees. She sends a messenger to Ballynahinch to summon Donnell to her. After a day or two he arrives. There is a romantic scene between them, but when Donnell hears that Grania has no intention of giving up the chieftainship, he rebels at the thought of marriage. His rebellion is shortlived, however, and the chapter ends with Grania and Donnell betrothed to one another.

Turning to Mrs. Meyer's book, Chapter 3 opens with the voyage of the O'Malley galleys to Galway Bay. Don Felipe is put aboard a Spanish galleon to return to Spain. Grania then pays a visit to the chief of the O'Briens who lives on an island in the Bay. At nightfall, the O'Malley galleys set out upon the return voyage to Clare Island. Owen O'Malley's galley is attacked by two English ships. In the usual melee, Owen is severely wounded. Grania takes command and leads the O'Malleys to victory. They return home with their wounded chieftain and with one of the captured English vessels.

Chapter 4 deals at the outset with the rivalry for leadership of the clan during the incapacity of the chief between Grania and Eoin O'Malley, one of the clan elders. Grania is supported by young Tomas. A crisis is averted, however, by Owen's recovery, but shortly thereafter Owen goes to sea for a raid in the Desmond country and upon his return his galley is wrecked in a storm and Owen is lost. The competition between Grania and Eoin then intensifies. Donal, Grania's younger brother, takes no interest

---

4. The fact that Grania did marry Donnell O'Flaherty is recorded in previously published history or legend.

in clan affairs and has no aspirations to the chieftainship.

Chapter 5 builds up the suspense as to who is to become the new chief. Tomas suggests that if Grania would marry him, they could rule together. Grania eventually rejects this suggestion. There are various incidents, one of which is the burning of the captured English ship by Grania in order to prevent Eoin from disposing of it in Galway. The brehons conduct an investigation of this affair. Grania frankly admits her act, and the feeling between her and Eoin grows more bitter. The chapter ends, however, before a climax is reached.

It is in Chapter 6 that the election of the new chief takes place, six months after Owen's death. Grania is elected. At the investiture ceremony, she is clothed in a white gown. She stands on the coronation stone and a straight white wand is handed to her. Eoin, defeated, disappears.

Beyond this point there is no basis for a direct comparison of the text of the two works, for plaintiff's manuscript ends with Chapter 5. It may be noted, however, that in Mrs. Meyer's book, Tomas, although in love with Grania, refrains from pressing his suit in competition with Donnell O'Flaherty. It should also be mentioned that the thought expressed in plaintiff's fifth chapter to the effect that Grania will divide her time equally between the O'Malleys and the O'Flahertys, also appears in Chapter 8 of Mrs. Meyer's book. Mrs. Meyer testified that she independently invented this arrangement, for which there is no historical basis.

Moreover, certain incidents only briefly mentioned in plaintiff's outline and summary of her proposed novel, are dealt with by Mrs. Meyer in the latter portion of her work. Examples are Grania's successful battle with Turkish pirates immediately after she has given birth to a son at sea, the murder of Grania's sons by the English, Grania's capture by the English and her release through the efforts of a man known as the "Devil's Hook," and the story of Grania's second marriage to Sir Richard Burke under an agreement by which each is free to "dismiss" the other after a year and a day. Some of these incidents, at least, appear to have been referred to in previous fictional accounts of Grania's life. Finally, it may not be wholly without significance that the meeting between Grania and Queen Elizabeth, for which there is a historical basis, is the final episode, both in plaintiff's outline and in Mrs. Meyer's book.

In making the foregoing comparison, I have omitted other details, such as the reference to rushes on the floor, greyhounds, Scottish mercenaries in the employ of Irish chieftains, and the like, on the theory that such background material was readily available to both authors in published descriptions of the life and manners of the times. The use of the "white wand of sovereignty" and the "crowning stone" in the investiture ceremony, which I have mentioned, may also come within this category.

■ The necessary elements of an infringement action are essentially the same, whether the alleged infringement is of uncopyrighted, unpublished material, as in this case, or of published material protected by statutory copyright. See Nimmer, Copyright, § 141, p. 610 (Bender 1964).

■ The law of New York governs this diversity case. On the points involved here, there seems to be no significant difference between the New York law applicable to uncopyrighted material and the federal law applicable to statutory copyright.

■ There are two principal elements. To prove infringement, plaintiff must establish (1) that plaintiff's work was copied in the allegedly infringing work, and (2) that if so, a material and substantial portion of plaintiff's work was copied. Arnstein v. Porter, 154 F.2d 464 (2d Cir. 1946); Heim v. Universal Pictures Co., 154 F.2d 480 (2d Cir. 1946); Fendler v. Morosco, 253 N.Y. 281, 171 N.E. 56 (1930); Malkin v. Dubinsky, 25 Misc.2d 460, 203 N.Y.S.2d 501 (1960).

■■ Where, as here, copying is denied by defendant, it may nevertheless be proved by circumstantial evidence of (a) access on the part of defendant to plaintiff's work, and (b) similarities between the respective works. There is some uncertainty in the cases as to whether "access" means that defendant actually saw plaintiff's work or merely that defendant had an opportunity to see it. The latter views seems preferable to me. See De Acosta v. Brown, 146 F.2d 408 (2d Cir. 1944), cert. denied sub nom. Hearst Magazines v. De Acosta, 325 U.S. 862, 65 S.Ct. 1197, 89 L.Ed. 1983 (1945); Nimmer, Copyright, supra § 142, p. 614.

In the present case there was certainly access in that sense. Plaintiff's manuscript was in Little, Brown's Boston office, where Miss Jones was employed, from May 3, 1957 to at least May 14, if not longer. Miss Jones had the opportunity to see it there. Miss Jones thus had access to the manuscript and Mrs. Meyer had access to Miss Jones.

■ As to similarities between the works, they are in my opinion sufficiently strong to permit, and indeed to compel, the inference of copying. It is difficult to believe that two people, each sitting down to write a book about Grania O'Malley, entirely independent of each other, would each decide to begin the story on Grania's eighteenth birthday, would each recount that Grania went to watch for her father's return from sea, would each conceive the idea of a party upon her father's return, and would each provide a substantially similar account of that party. The difficulty of ascribing this to coincidence becomes insuperable when we add to this parallel the fact that in each book Grania's horse is named Maeve, in each book she is upbraided for clothing not befitting "a woman grown," and that in each book, on her way to watch for her father, she discusses or reflects upon Queen Elizabeth. Nor do I think it plausible that each author would independently invent the unusual matrimonial arrangement under which Grania agreed to spend half her time with her husband's people and half with her own. There is no need to repeat here all the resemblances which are made manifest by the summaries I have heretofore set forth of the opening chapters of the two works, the parallel between the characters of gnarled old Annie and faithful old Nessa, or between loyal self-effacing Teigue and equally loyal self-effacing Tomas, or the coincidence of the sea fights in which Grania first demonstrates her warlike prowess or the fact that in each book Grania demonstrates her skill in marksmanship at an early stage. I am convinced that Mrs. Meyer knew of plaintiff's manuscript and that she knowingly made use of such parts of it as she saw fit. She must either have seen it or have been told about it in great detail. In either case, her unauthorized use of plaintiff's literary property is copying. I so find.

■ I also find that it was Miss Jones who made that copying possible, that it was she who either showed plaintiff's manuscript to Mrs. Meyer or gave her a detailed account of it. The evidence all points to that conclusion. There is no other probable explanation of how this was accomplished. I conclude, therefore, that plaintiff has established the first element of her case.

■ As to the second element, different considerations apply. It is apparent that the portion of plaintiff's manuscript which Mrs. Meyer copied constituted only a relatively small part of Mrs. Meyer's book. But that is not the test. The question is whether Mrs. Meyer appropriated a material and substantial portion of plaintiff's work. Nikanov v. Simon & Schuster, Inc., 246 F.2d 501 (2d Cir. 1957); De Acosta v. Brown, supra; Nimmer, Copyright, supra § 143.12, p. 629.

The answer to this question is a matter of judgment. Both quantity and quality are to be considered. How much of plaintiff's work has been copied and how important is the portion copied to the work as a whole?

As to quantity, it is apparent that not all of plaintiff's work was appropriated. Some incidents, as for example, the fair at Galway described in plaintiff's Chapter 3, do not appear in Mrs. Meyer's book at all, and there is by no means complete duplication of plaintiff's other four chapters. Mrs. Meyer has invented variations of her own upon the incidents related by plaintiff. She has created some characters of her own, Don Felipe, for example, and some incidents of her own, as for example, the visit to the soothsayer. Nevertheless, with the sole exception of plaintiff's Chapter 3, the pattern of events in the five completed chapters of plaintiff's work finds its ccounterpart, by and large, in Mrs. Meyer's book, disguised and changed in various respects, but still plainly recognizable.

The five completed chapters constitute the bulk of plaintiff's manuscript. The rest is but a projection of work which plaintiff intended to do but had not as yet performed. Even here there seems to have been some appropriation by Mrs. Meyer. Incidents invented by plaintiff and mentioned by her only in bare outline are developed by Mrs. Meyer in detail.

As to quality, I have no doubt that the incidents which have been copied are significant in plaintiff's work. The concept and pattern which has been appropriated is that of a young girl, rugged and uncouth, skilled in horsemanship and and marksmanship, who becomes of age, who celebrates that event with revelry, and very shortly thereafter, by reason of her father's unexpected death, emerges, after a political struggle within the clan, as the chief and leader of her people. This is the heart and core of plaintiff's work, and for the most part it is the product of plaintiff's invention. Although history and legend record that Grania was the leader of the O'Malleys, there is no other published account, as far as the evidence shows, of the detailed circumstances under which she attained that position.

█ To put it as succinctly as possible, the story of how Grania became chief of the O'Malleys is, both quantitatively and qualitatively, the essence of plaintiff's five chapters, and it is that story that Mrs. Meyer has appropriated. In my opinion, enough has been copied here to satisfy the rule of substantiality. I so find. Nikanov v. Simon & Schuster, Inc., supra; De Acosta v. Brown, supra; College Entrance Book Co. v. Amsco Book Co., Inc., 119 F.2d 874 (2d Cir. 1941); Universal Pictures Co. v. Harold Lloyd Corporation, 162 F.2d 354 (9th Cir. 1947).

I conclude, therefore, that plaintiff has proved the second necessary element of her case.

It is clear that Little, Brown is liable for publishing the infringing work. In the first place, it is by no means clear that Little, Brown is merely an innocent infringer, for not only did its employee, Miss Jones, participate in the copying, but also it was Miss Jones who, in the course of her employment as editor of Little, Brown's Juvenile Department, had the responsibility for working with Mrs. Meyer on her book and arranging for its publication. Miss Jones' knowledge that the book contained plagiarized material would appear to be binding upon Little, Brown under these circumstances. See Shapiro, Bernstein & Co. v. H. L. Green Company, 316 F.2d 304 (2d Cir. 1963).

█ It is not necessary, however, to rest defendant's liability on that ground, for even if Little, Brown were completely innocent, and had published a work which none of its employees knew contained material copied from plaintiff's work, it would still be liable to plaintiff for infringement. Shapiro, Bernstein & Co. v. H. L. Green Company, supra; De Acosta v. Brown, supra.

Defendant's motion to dismiss the complaint is denied.

█ I conclude that plaintiff is entitled to an injunction against the further publication by defendant of "Pirate

Queen." An interlocutory judgment so providing may be submitted.

The pre-trial order provides that the issue of damages shall be deferred until after the determination of the issue of liability. Accordingly, the interlocutory judgment to be submitted shall make appropriate provision for a further trial before the court of the issues as to plaintiff's damages, including plaintiff's claim to punitive damages, and as to the profits of defendant Little, Brown.

Pursuant to Rule 52(a) this opinion constitutes the court's findings of fact and conclusions of law.

Settle interlocutory judgment on notice.